**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **SHARODERICK ANTON SMITH,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **Civil Action No. 3:06-cv-00834-WKW-VPM** |
| | ) |
| **LEON AARON, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**DEFENDANTS' SPECIAL REPORT**

COME NOW Major Cary Torbert, Jr.[1], Lieutenant Ray Roberson[2], Lieutenant Corey Welch, Sergeant Tommy Threat, and Officer Leon Aaron, the Defendants in the above-styled cause, and submit their Special Report to the Court.

**INTRODUCTION**

On September 18, 2006, the Plaintiff filed his Complaint in the United States District Court for the Middle District of Alabama against these Defendants as well as the "Lee County Jail." On September 20, 2006, this Court ordered these Defendants to file a Special Report and Answer. Pursuant to this Court's Order dated November 21, 2006, their Special Report and Answer are on due December 4, 2006. On November 21, 2006, this Court entered an Order dismissing the "Lee County Detention Center" from this case.

The Plaintiff was arrested on July 19, 2006, on five charges of failure to appear regarding various charges. (Exhibit A, Inmate File of Sharoderick Anton Smith[3], "Inmate File," Booking Sheet dated July 19, 2004, pp. 2-4.) He was booked into the Lee County Detention Center that same day. (Ex. A, p. 1.) On July 21, 2006, the Plaintiff pled guilty to Possession/Receiving a

---

[1] Incorrectly designated in the Plaintiff's Complaint as "Major Tolbert."
[2] Incorrectly designated in the Plaintiff's Complaint as "Lt Robinson."
[3] See Exhibit C, Affidavit of Cary Torbert, Jr., "Torbert Aff.," ¶ 30 for certification of Plaintiff's Inmate File.

Controlled Substance and was sentenced to one year imposed confinement, nine years suspended confinement, and four years probation. (Exhibit B, Inmate File, Conviction Report dated July 21, 2006.) Therefore, the Plaintiff was a convicted prisoner at the time of the allegations made the basis of his Complaint.

## PLAINTIFF'S ALLEGATIONS

The Plaintiff's Complaint alleges the following violations of his constitutional rights:

(1)    The Plaintiff first alleges that he was subjected to excessive force by Officer Leon Aaron. (Doc. 1-1, Plaintiff's Complaint, pp. 2-3.)

(2)    The Plaintiff also alleges that he was placed in lockdown and that he does not think that his disciplinary hearing was fair. (Doc. 1-1, Plaintiff's Complaint, pp. 3; Doc. 1-2, Attachments to Plaintiff's Complaint, pp. 5 – 12.)

(3)    The Plaintiff finally alleges that his lockdown cell was unsanitary; that he was only allowed 15 minutes out of the cell to take a shower; that there are bugs in the shower area; that the shower area is unsanitary; that he only has access to laundry every few days; and that he did not get a phone call to his attorney. (Doc. 1-1, Plaintiff's Complaint, p. 3.)

The Plaintiff requests the following relief: "immunity," $500,000 for pain and suffering, and for Major Torbert, Lt. Welch, Lt. Roberson, Sgt. Threat, and Officer Aaron to be fired. (Doc. 1-1, Plaintiff's Complaint, p. 5.)

## DEFENDANTS' RESPONSE TO PLAINTIFF'S ALLEGATIONS

The Defendants deny the allegations made against them by the Plaintiff as being untrue and completely without basis in law or fact. The Defendants deny that they acted, or caused anyone to act, in such a manner as to deprive the Plaintiff of any right to which he was entitled.

(Exhibit C, Affidavit of Major Cary Torbert, Jr.[4], "Torbert Aff.," ¶ 4; Exhibit D, Affidavit of Lieutenant Ray Roberson[5], "Roberson Aff.," ¶ 4; Exhibit E, Affidavit of Lieutenant Corey Welch[6], "Welch Aff.," ¶ 4; Exhibit F, Affidavit of Sergeant Tommy Threat[7], "Threat Aff.," ¶ 4; Exhibit G, Affidavit of Corrections Officer Leon Aaron[8], "Aaron Aff.," ¶ 4.)  The Defendants raise the defenses of Eleventh Amendment immunity, qualified immunity, the Plaintiff's failure to meet the exhaustion and physical injury requirements of the Prison Litigation Reform Act, quasi-judicial immunity, and additional defenses presented below.  The Defendants reserve the right to add additional defenses upon a complete investigation of the Plaintiff's claims, completion of any discovery allowed, and if any further pleading is required or allowed by the Court.

## I.     FACTS

### A.     Policies and Procedures of the Lee County Detention Center

As Sheriff of Lee County, Jay Jones is responsible for promulgating the policies governing the Lee County Detention Center.  (Exhibit N, Affidavit of Jay Jones, "Jones Aff.," ¶ 4.)

---

[4] Cary Torbert, Jr., is the Chief Deputy of Corrections of the Lee County Detention Center and has obtained the rank of Major.  Major Torbert has worked with the Lee County Sheriff's Office for over 34 years.  (Torbert Aff. ¶ 2.)

[5] Ray Roberson is employed with the Lee County Sheriff's Office and serves as Assistant Jail Administrator at the Lee County Detention Center.  Roberson has worked in the Lee County Detention Center for twenty-three years and has obtained the rank of Lieutenant.  (Roberson Aff. ¶ 2.)

[6] Corey Welch is employed by the Lee County Sheriff's Office and assigned to serve as a Corrections Officer at the Lee County Detention Center.  Welch has worked as a correctional officer for over ten years, having obtained the rank of Lieutenant in November 2004.  Lieutenant Welch is both a graduate of the Police Academy and the Alabama Jail Management School.  (Welch Aff. ¶ 2.)

[7] Tommy Threat is employed by the Lee County Sheriff's Office and is assigned to serve at the Lee County Detention Center.  Threat has achieved the rank of Sergeant.  Sergeant Threat has been employed at the Lee County Detention Center for six (6) years, and he is a graduate of the Alabama Jail Management School.  (Threat Aff. ¶ 2.)

[8] Leon Aaron is employed by the Lee County Sheriff's Office and is assigned to serve as a Corrections Officer at the Lee County Detention Center.  Aaron has worked as a correctional officer for three and one-half (3 1/2) years and is a graduate of the Alabama Jail Management School.
 (Aaron Aff. ¶ 2.)

Inmate counting procedures are conducted at the change of each shift to ensure the security of the facility. (Jones Aff. ¶ 5; Torbert Aff. ¶ 5; Roberson Aff. ¶ 5; Welch Aff. ¶ 5; Threat Aff. ¶ 5; Aaron Aff. ¶ 5.) The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively. (Jones Aff. ¶ 6; Torbert Aff. ¶ 6; Roberson Aff. ¶ 6; Welch Aff. ¶ 6; Threat Aff. ¶ 6; Aaron Aff. ¶ 6.) Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility. (Jones Aff. ¶ 7; Torbert Aff. ¶ 7; Roberson Aff. ¶ 7; Welch Aff. ¶ 7; Threat Aff. ¶ 7; Aaron Aff. ¶ 7.)

All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m. All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list. All inmates are aware of these rules by access to the inmate handbook. (Jones Aff. ¶ 8; Torbert Aff. ¶ 8; Roberson Aff. ¶ 8; Welch Aff. ¶ 8; Threat Aff. ¶ 8; Aaron Aff. ¶ 8.)

It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation. (Jones Aff. ¶ 9; Torbert Aff. ¶ 9; Roberson Aff. ¶ 9; Welch Aff. ¶ 9; Threat Aff. ¶ 9; Aaron Aff. ¶ 9.) It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center. (Jones Aff. ¶ 10; Torbert Aff. ¶ 10; Roberson Aff. ¶ 10; Welch Aff. ¶ 10; Threat Aff. ¶ 10; Aaron Aff. ¶ 10.) The Lee County Sheriff's Office operates

4

the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control. (Jones Aff. ¶ 11; Torbert Aff. ¶ 11; Roberson Aff. ¶ 11; Welch Aff. ¶ 11; Threat Aff. ¶ 11; Aaron Aff. ¶ 11.) When the use of force is necessary, only the minimum amount needed to accomplish the task at hand is used. (Jones Aff. ¶ 12; Torbert Aff. ¶ 12; Roberson Aff. ¶ 12; Welch Aff. ¶ 12; Threat Aff. ¶ 12; Aaron Aff. ¶ 12.) Physical force is used only as a last resort. All reasonable attempts are made to identify and utilize alternative means to deal with the situation. (Jones Aff. ¶ 13; Torbert Aff. ¶ 13; Roberson Aff. ¶ 13; Welch Aff. ¶ 13; Threat Aff. ¶ 13; Aaron Aff. ¶ 13.) Physical force or chemical agents may be used in the following incidences: (a) Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person; (b) In defending one's self or others against any physical assault; (c) To prevent the commission of a misdemeanor; (d) To prevent serious damage to property; (e) To enforce Detention Center regulations; (f) To prevent or quell a riot. (Jones Aff. ¶ 14; Torbert Aff. ¶ 14; Roberson Aff. ¶ 14; Welch Aff. ¶ 14; Threat Aff. ¶ 14; Aaron Aff. ¶ 14.)

It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person. (Jones Aff. ¶ 15; Torbert Aff. ¶ 15; Roberson Aff. ¶ 15; Welch Aff. ¶ 15; Threat Aff. ¶ 15; Aaron Aff. ¶ 15.) It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing. (Jones Aff. ¶ 16; Torbert Aff. ¶ 16; Roberson Aff. ¶ 16; Welch Aff. ¶ 16;

Threat Aff. ¶ 16; Aaron Aff. ¶ 16.)  The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee and others who were not directly involved in the incident being reviewed. (Jones Aff. ¶ 17; Torbert Aff. ¶ 17; Roberson Aff. ¶ 17; Welch Aff. ¶ 17; Threat Aff. ¶ 17; Aaron Aff. ¶ 17.)  The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.  (Jones Aff. ¶ 18; Torbert Aff. ¶ 18; Roberson Aff. ¶ 18; Welch Aff. ¶ 18; Threat Aff. ¶ 18; Aaron Aff. ¶ 18.)  The Hearing Board must convene within seven days, excluding weekends and holidays, of the time the inmate was notified of his charges.  (Jones Aff. ¶ 19; Torbert Aff. ¶ 19; Roberson Aff. ¶ 19; Welch Aff. ¶ 19; Threat Aff. ¶ 19; Aaron Aff. ¶ 19.)

Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held.  The inmate may consent to a hearing within less than 24 hours, but he must do so in writing.  (Jones Aff. ¶ 20; Torbert Aff. ¶ 20; Roberson Aff. ¶ 20; Welch Aff. ¶ 20; Threat Aff. ¶ 20; Aaron Aff. ¶ 20.)  An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.  (Jones Aff. ¶ 21; Torbert Aff. ¶ 21; Roberson Aff. ¶ 21; Welch Aff. ¶ 21; Threat Aff. ¶ 21; Aaron Aff. ¶ 21.)  Each side has the right to present witnesses on its own behalf.  The inmate does not have the right to cross-examine witnesses.  The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information.  If the Board denies an inmate's request to present a witness, the reason is documented on the disciplinary report.  (Jones Aff. ¶ 22; Torbert Aff. ¶ 22; Roberson Aff. ¶ 22; Welch Aff. ¶ 22; Threat Aff. ¶ 22; Aaron Aff. ¶ 22.)  The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence.  The Board documents reasons for such exclusion on the Disciplinary Report.  (Jones Aff. ¶ 23; Torbert Aff. ¶ 23; Roberson Aff. ¶ 23; Welch Aff. ¶ 23; Threat Aff. ¶ 23; Aaron Aff. ¶

23.)  Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.  (Jones Aff. ¶ 24; Torbert Aff. ¶ 24; Roberson Aff. ¶ 24; Welch Aff. ¶ 24; Threat Aff. ¶ 24; Aaron Aff. ¶ 24.)

The Hearing Board must find the inmate guilty or not guilty of the charges specified.  If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.  (Jones Aff. ¶ 25; Torbert Aff. ¶ 25; Roberson Aff. ¶ 25; Welch Aff. ¶ 25; Threat Aff. ¶ 25; Aaron Aff. ¶ 25.)  The Board writes the hearing results on the disciplinary report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review.  If the inmate is found not guilty, the hearing board must remove the notification of charges form from the inmate's file.  (Jones Aff. ¶ 26; Torbert Aff. ¶ 26; Roberson Aff. ¶ 26; Welch Aff. ¶ 26; Threat Aff. ¶ 26; Aaron Aff. ¶ 26.)  Interfering with lockdowns or counts is a major offense, and profanity or derogatory remarks or gestures to a staff member is a major offense.  (Jones Aff. ¶ 27; Torbert Aff. ¶ 27; Roberson Aff. ¶ 27; Welch Aff. ¶ 27; Threat Aff. ¶ 27; Aaron Aff. ¶ 27.)

If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status.  The customary time limit for disciplinary status for a major offense is up to 10 days.  (Jones Aff. ¶ 28; Torbert Aff. ¶ 28; Roberson Aff. ¶ 28; Welch Aff. ¶ 28; Threat Aff. ¶ 28; Aaron Aff. ¶ 28.)  An inmate on disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.  (Jones Aff. ¶ 29; Torbert Aff. ¶ 29; Roberson Aff. ¶ 29; Welch Aff. ¶ 29;

Threat Aff. ¶ 29; Aaron Aff. ¶ 29.)

It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff. (Jones Aff. ¶ 30; Torbert Aff. ¶ 30; Roberson Aff. ¶ 30; Welch Aff. ¶ 30; Threat Aff. ¶ 30; Aaron Aff. ¶ 30.) It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment. (Jones Aff. ¶ 31; Torbert Aff. ¶ 31; Roberson Aff. ¶ 31; Welch Aff. ¶ 31; Threat Aff. ¶ 31; Aaron Aff. ¶ 31.) It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary. (Jones Aff. ¶ 32; Torbert Aff. ¶ 32; Roberson Aff. ¶ 32; Welch Aff. ¶ 32; Threat Aff. ¶ 32; Aaron Aff. ¶ 32.) Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily. (Jones Aff. ¶ 33; Torbert Aff. ¶ 33; Roberson Aff. ¶ 33; Welch Aff. ¶ 33; Threat Aff. ¶ 33; Aaron Aff. ¶ 33.) The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas. (Jones Aff. ¶ 34; Torbert Aff. ¶ 34; Roberson Aff. ¶ 34; Welch Aff. ¶ 34; Threat Aff. ¶ 34; Aaron Aff. ¶ 34.) Each cleaning consists of the following: Floors are swept and mopped. Toilets are scrubbed with toilet cleanser and disinfectant. Sinks and showers are scrubbed with scouring cleanser and disinfectant. Tables and benches are washed. Bunks and sleeping areas are made clean and orderly. Trash receptacles are emptied and washed daily. (Jones Aff. ¶ 35; Torbert Aff. ¶ 35; Roberson Aff. ¶ 35; Welch Aff. ¶ 35; Threat Aff. ¶ 35; Aaron Aff. ¶ 35.) The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

(Jones Aff. ¶ 36; Torbert Aff. ¶ 36; Roberson Aff. ¶ 36; Welch Aff. ¶ 36; Threat Aff. ¶ 36; Aaron Aff. ¶ 36.)  The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.  (Jones Aff. ¶ 37; Torbert Aff. ¶ 37; Roberson Aff. ¶ 37; Welch Aff. ¶ 37; Threat Aff. ¶ 37; Aaron Aff. ¶ 37.)

It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.  (Jones Aff. ¶ 38; Torbert Aff. ¶ 38; Roberson Aff. ¶ 38; Welch Aff. ¶ 38; Threat Aff. ¶ 38; Aaron Aff. ¶ 38.)  The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month.  A licensed pest control service is contracted to provide control for vermin and insects.  Detention Center personnel utilize this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.  (Jones Aff. ¶ 39; Torbert Aff. ¶ 39; Roberson Aff. ¶ 39; Welch Aff. ¶ 39; Threat Aff. ¶ 39; Aaron Aff. ¶ 39.)  Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the chief deputy.  (Jones Aff. ¶ 40; Torbert Aff. ¶ 40; Roberson Aff. ¶ 40; Welch Aff. ¶ 40; Threat Aff. ¶ 40; Aaron Aff. ¶ 40.)  All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.  (Jones Aff. ¶ 41; Torbert Aff. ¶ 41; Roberson Aff. ¶ 41; Welch Aff. ¶ 41; Threat Aff. ¶ 41; Aaron Aff. ¶ 41.)

It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that sanitation and hygiene may be maintained.  All facility issued clothing and linens are laundered according to established schedules.  (Jones Aff. ¶ 42; Torbert Aff. ¶ 42; Roberson Aff. ¶ 42; Welch Aff. ¶ 42; Threat Aff. ¶

42; Aaron Aff. ¶ 42.)  Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.  (Jones Aff. ¶ 43; Torbert Aff. ¶ 43; Roberson Aff. ¶ 43; Welch Aff. ¶ 43; Threat Aff. ¶ 43; Aaron Aff. ¶ 43.)  All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.  (Jones Aff. ¶ 44; Torbert Aff. ¶ 44; Roberson Aff. ¶ 44; Welch Aff. ¶ 44; Threat Aff. ¶ 44; Aaron Aff. ¶ 44.)  Any inmates on work release have their clothing laundered daily, if necessary.  (Jones Aff. ¶ 45; Torbert Aff. ¶ 45; Roberson Aff. ¶ 45; Welch Aff. ¶ 45; Threat Aff. ¶ 45; Aaron Aff. ¶ 45.)  The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week.  The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week.  Clothing belonging to trusties is laundered on Wednesdays and Saturdays.  (Jones Aff. ¶ 46; Torbert Aff. ¶ 46; Roberson Aff. ¶ 46; Welch Aff. ¶ 46; Threat Aff. ¶ 46; Aaron Aff. ¶ 46.)  Any contaminated clothing is washed separately from all other laundry.  (Jones Aff. ¶ 47; Torbert Aff. ¶ 47; Roberson Aff. ¶ 47; Welch Aff. ¶ 47; Threat Aff. ¶ 47; Aaron Aff. ¶ 47.)  Inmate linens are collected to be laundered at least once each week.  (Jones Aff. ¶ 48; Torbert Aff. ¶ 48; Roberson Aff. ¶ 48; Welch Aff. ¶ 48; Threat Aff. ¶ 48; Aaron Aff. ¶ 48.)  Blankets are laundered at least once each month.  (Jones Aff. ¶ 49; Torbert Aff. ¶ 49; Roberson Aff. ¶ 49; Welch Aff. ¶ 49; Threat Aff. ¶ 49; Aaron Aff. ¶ 49.)

It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.  (Jones Aff. ¶ 50; Torbert Aff. ¶ 50; Roberson Aff. ¶ 50; Welch Aff. ¶ 50; Threat Aff. ¶ 50; Aaron Aff. ¶ 50.)  All members of the Detention Center staff make every effort to facilitate private, uncensored communications between inmates and their attorneys.  (Jones Aff. ¶ 51; Torbert Aff. ¶ 51; Roberson Aff. ¶ 51; Welch Aff. ¶ 51; Threat Aff. ¶ 51; Aaron Aff. ¶ 51.)

Members of the Detention Center staff commit no act(s) which will deny or hinder in any way the right of an inmate to have access to the courts. (Jones Aff. ¶ 52; Torbert Aff. ¶ 52; Roberson Aff. ¶ 52; Welch Aff. ¶ 52; Threat Aff. ¶ 52; Aaron Aff. ¶ 52.) Written legal materials from inmates which they intend to be carried by the United States mail will be mailed immediately without being opened or read. (Jones Aff. ¶ 53; Torbert Aff. ¶ 53; Roberson Aff. ¶ 53; Welch Aff. ¶ 53; Threat Aff. ¶ 53; Aaron Aff. ¶ 53.) Inmates are given access to the telephones in the dayroom each day from 7:00 a.m. until 9:00 p.m. (Jones Aff. ¶ 54; Torbert Aff. ¶ 54; Roberson Aff. ¶ 54; Welch Aff. ¶ 54; Threat Aff. ¶ 54; Aaron Aff. ¶ 54.) Telephone privileges are also extended to persons not incarcerated in the dayroom area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and 9:00 p.m. (Jones Aff. ¶ 55; Torbert Aff. ¶ 55; Roberson Aff. ¶ 55; Welch Aff. ¶ 55; Threat Aff. ¶ 55; Aaron Aff. ¶ 55.) Inmates are entitled to privileged visits at any reasonable time as determined by the chief deputy sheriff. (Jones Aff. ¶ 56; Torbert Aff. ¶ 56; Roberson Aff. ¶ 56; Welch Aff. ¶ 56; Threat Aff. ¶ 56; Aaron Aff. ¶ 56.) Persons incarcerated in the Lee County Detention Center may have access to the Lee County Detention Center Law Library after submitting a written request to the chief deputy sheriff, captain, lieutenant, or shift supervisor. (Jones Aff. ¶ 57; Torbert Aff. ¶ 57; Roberson Aff. ¶ 57; Welch Aff. ¶ 57; Threat Aff. ¶ 57; Aaron Aff. ¶ 57.) If possible, the inmate requesting access to the library should make a specific request for materials needed. If this is possible, a member of the Detention Center staff will obtain copies of those materials and return them to the inmate. If not, the inmate will be taken to the library at the next available time. (Jones Aff. ¶ 58; Torbert Aff. ¶ 58; Roberson Aff. ¶ 58; Welch Aff. ¶ 58; Threat Aff. ¶ 58; Aaron Aff. ¶ 58.) Inmates in segregation who may not visit the library may make requests for specific documents. (Jones Aff. ¶ 59; Torbert Aff. ¶ 59; Roberson Aff. ¶ 59; Welch Aff. ¶ 59; Threat Aff. ¶ 59; Aaron Aff. ¶ 59.)

11

It is the policy of the Lee County Sheriff's Office to encourage correspondence between inmates housed in the Lee County Detention Center and those persons in the community who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press. (Jones Aff. ¶ 60; Torbert Aff. ¶ 60; Roberson Aff. ¶ 60; Welch Aff. ¶ 60; Threat Aff. ¶ 60; Aaron Aff. ¶ 60.) Inmates may write an unlimited number of letters. Stamps, writing paper, envelopes, and pencils are available for purchase at the commissary. Indigent inmates are given enough supplies to write and mail up to three letters each week. (Jones Aff. ¶ 61; Torbert Aff. ¶ 61; Roberson Aff. ¶ 61; Welch Aff. ¶ 61; Threat Aff. ¶ 61; Aaron Aff. ¶ 61.)

It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the sheriff, chief deputy sheriff, or Detention Center personnel. (Jones Aff. ¶ 62; Torbert Aff. ¶ 62; Roberson Aff. ¶ 62; Welch Aff. ¶ 62; Threat Aff. ¶ 62; Aaron Aff. ¶ 62.) Inmates housed in the Lee County Detention Center are furnished with inmate request forms for the purpose of stating their requests or grievances in writing. Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate. The officer receiving the request form is to answer the request if possible. If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered. If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed. If the officer to whom the request is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day. (Jones Aff. ¶ 63; Torbert Aff. ¶ 63; Roberson Aff. ¶ 63;

Welch Aff. ¶ 63; Threat Aff. ¶ 63; Aaron Aff. ¶ 63.)  Neither Major Torbert, Lieutenant Roberson, Tommy Threat, nor Officer Aaron have ever received any request form from the Plaintiff concerning any of the allegations made the basis of his Complaint.  (Torbert Aff. ¶ 64; Roberson Aff. ¶ 64; Threat Aff. ¶ 64; Aaron Aff. ¶ 64.)   The Plaintiff has never made any request to Lieutenant Welch regarding the sanitation of his cell.  (Welch Aff. ¶ 66.)

Internal grievance procedures at the Lee County Detention Center are available to all inmates.  It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.  (Jones Aff. ¶ 64; Torbert Aff. ¶ 65; Roberson Aff. ¶ 65; Welch Aff. ¶ 64; Threat Aff. ¶ 65; Aaron Aff. ¶ 65.)  All inmates are provided access to a Lee County Detention Center Inmate Handbook.  A copy of this handbook is placed in each cellblock for inmates to review whenever they wish.  The inmate handbook states that an inmate may report a grievance on an inmate request form.  Grievances are first answered by the appropriate staff at the lowest level in the chain of command.  The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to the Sheriff, and he will make the final decision.  (Jones Aff. ¶ 65; Torbert Aff. ¶ 66; Roberson Aff. ¶ 66; Welch Aff. ¶ 65; Threat Aff. ¶ 66; Aaron Aff. ¶ 66.)  Neither Sheriff Jones, Major Torbert, Lieutenant Roberson, Sergeant Threat, nor Officer Aaron have ever received a grievance from the Plaintiff concerning any of the allegations made the basis of his Complaint.  (Jones Aff. ¶ 66; Torbert Aff. ¶ 67; Roberson Aff. ¶ 67; Threat Aff. ¶ 67; Aaron Aff. ¶ 67.)  Per Lee County Sheriff's Office policy, an inmate has the opportunity to appeal any grievance to Lieutenant Roberson, Major Torbert, and Sheriff Jones if he were not satisfied with the response at the lower levels in the chain of command.  The Plaintiff has not appealed any

grievance to them.  Accordingly, the Plaintiff has failed to exhaust his administrative remedies at the Lee County Detention Center.  (Jones Aff. ¶ 66; Torbert Aff. ¶ 67; Roberson Aff. ¶ 67.)

All the Defendants have complied with all policies and procedures of the Lee County Detention Center.  They are not aware of nor have they authorized or allowed any deviation from said policies and procedures.  (Torbert Aff. ¶ 68; Roberson Aff. ¶ 68; Welch Aff. ¶ 66; Threat Aff. ¶ 68; Aaron Aff. ¶ 77.)

### B.     August 10, 2006 Incident and Related Disciplinary Hearing

On August 10, 2006, at approximately 7:45 a.m., Officer Aaron was conducting headcount in cell D-3.  As Officer Aaron was calling names for headcount, the Plaintiff stated: could you keep the noise down.  The Plaintiff's head was covered with his blanket and so Officer Aaron approached the bunk, tapped him to get his attention, and then pulled the blanket back to verify who the inmate was.  (Aaron Aff. ¶ 68; Exhibit H, Special Report by Officer Aaron, "Aaron Report".)  The Plaintiff then sat up and started speaking loudly and belligerently to Officer Aaron saying:  why are you putting your hands on me.  (Aaron Aff. ¶ 69; Aaron Report.) Officer Aaron told the Plaintiff to get his property together to be moved to D-4 because he was disturbing jail operations.  (Aaron Aff. ¶ 70; Aaron Report.)  The Plaintiff then replied:  "Fuck it."  Just put me in E-6. (Aaron Aff. ¶ 71; Aaron Report.)

Officer Aaron exited the cell at that time to complete the headcount.  Then he returned to cell D-3 to move the Plaintiff to cell E-6.  (Aaron Aff. ¶ 72; Aaron Report.)  Officer Aaron and another officer, Officer Phillips, escorted the Plaintiff to the property room to go through his property before being escorted to E-6. (Aaron Aff. ¶ 73; Aaron Report; Exhibit I, Special Report by Matthew Phillips, "Phillips Report".)  The Plaintiff continued to make derogatory remarks towards the officers.  He stated that he wanted them to put their hands on him so he could sue

14

them. (Aaron Aff. ¶ 74; Aaron Report; Phillips Report.)  As they were passing cells E3 and E4 in

the hall of E-Wing, Officer Aaron was approximately 6 feet behind the Plaintiff, and Officer

Phillips was eight feet behind the Plaintiff.  At that time, the Plaintiff fell forward as if he were

pushed.  Officer Aaron did not use any force on the Plaintiff at the time he fell.  (Aaron Aff. ¶

76; Welch Aff. ¶ 67; Threat Aff. ¶ 68; Aaron Report; Phillips Report.)  The Plaintiff began

yelling and screaming as if he was injured.  The officers advised him to get up which he did.  He

then continued walking to E-6 without any problems.  (Aaron Aff. ¶ 75; Welch Aff. ¶ 67; Threat

Aff. ¶ 68; Aaron Report; Phillips Report.)  Lieutenant Welch and Sergeant Threat witnessed the

Plaintiff fake the fall while being escorted down the E-wing hall.  (Welch Aff. ¶ 67; Threat Aff. ¶

68.)

On August 12, 2006, the Plaintiff was seen by the nurse and the doctor for alleged back

pain from the fall.  (Exhibit K, Inmate Medical File, Notes by Nurse Linda Stewart dated August

12, 2006, "Stewart notes"; Exhibit L, Inmate Medical File, Notes by John McFarland, MD dated

August 15, 2006.)  Nurse Stewart noted that the Plaintiff claimed to not be able to bend to touch

his toes.  (Stewart notes.)  However, she observed that he was getting up and down out of his

chair without any difficulty.  (Stewart notes.)  Nurse Stewart gave the Plaintiff Motrin for pain

and referred him to Dr. McFarland.  (Stewart notes.)  On August 15, 2006, Dr. McFarland saw

the Plaintiff.  (McFarland notes.)  The Plaintiff stated that he landed on his right knee, but Dr.

McFarland noted that there was no sign of injury.  (McFarland notes.)  Although the Plaintiff

was stiff and tight in his low back, Dr. McFarland noted that the Plaintiff walked with a normal

gait, had no midline or point tenderness, and had no right effusion or other sign of trauma.

(McFarland notes.)  The Plaintiff was given an anti-inflammatory and a muscle relaxer.

(McFarland notes.)  Interestingly, the day *before* the Plaintiff alleges that he was pushed, he

signed a medical request form stating that his back was hurting and requested to see the doctor. (Exhibit M, Inmate Medical File, Inmate Request Slip dated August 9, 2006.)

After a disciplinary hearing, based on the testimony presented, the Plaintiff was found guilty of interfering with headcount and served ten days in lockdown by the three-member Disciplinary Board. The Plaintiff was given notice of the hearing and an opportunity to be heard at the hearing. He was also allowed to call witnesses at the hearing to testify in his defense. The Plaintiff was not permitted to be present during their testimony because of the concern that the witnesses would be intimidated by his presence which may have an effect on their testimony. (Threat Aff. ¶ 69; Exhibit J, Disciplinary Report.)

**II.    LAW**

     **A.    Any claims against the Defendants in their official capacities must fail based on Eleventh Amendment immunity and because they are not "persons" under 42 U.S.C. § 1983.**

The Plaintiff's claims against the Defendants, if any, in their official capacities are due to be dismissed for lack of subject matter jurisdiction as such claims are barred by the Eleventh Amendment to the United States Constitution. Parker v. Williams, 862 F.2d 1471, 1476 (11th Cir. 1989) (holding a sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); Carr v. City of Florence, Ala., 918 F.2d 1521, 1525 (11th Cir. 1990) (holding a deputy sheriff sued in his official capacity is entitled to Eleventh Amendment immunity); Lancaster v. Monroe County, 116 F.3d 1419, 1430-31 (11th Cir. 1997) (extending Eleventh Amendment immunity to include jailers employed by county sheriffs).

In addition, any official capacities claims must fail because 42 U.S.C. § 1983 prohibits a person, acting under color of law, from depriving another of his rights secured by the United States Constitution. 42 U.S.C. § 1983. The United States Supreme Court has held that state

16

officials, in their official capacities, are not "persons" under § 1983.  Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989).  Accordingly, any claims against the Defendants in their official capacities fail to state a claim upon which relief can be granted because they are not "persons" under § 1983, and therefore these claims are due to be dismissed.  Id.; Carr, 916 F.2d at 1525 n.3.

> **B.    The Plaintiff's failure to comply with the Prison Litigation Reform Act bars the Complaint.**

> **1.    The Plaintiff has failed to exhaust all Administrative Remedies.**

Under the Prison Litigation Reform Act ("PLRA"), an inmate is required to exhaust all administrative remedies before instituting an action under 42 U.S.C. § 1983.  42 U.S.C. § 1997e(a).  The Plaintiff in this case has not utilized two separate and distinct administrative remedies available to him.  First, the Plaintiff has not exhausted the grievance procedures provided at the Lee County Detention Center.  Despite the availability of a grievance procedure at the Lee County Detention Center the Plaintiff failed to appeal any grievance concerning the allegations made the basis of the Plaintiff's Complaint to the Assistant Jail Administrator, Chief Deputy of Corrections, or Sheriff.   Therefore, the Plaintiff has failed to exhaust his administrative remedies at the Lee County Detention Center.  Harper v. Jenkin, 179 F.3d 1311, 1312 (11th Cir. 1999) (affirming dismissal of complaint for failure to exhaust administrative remedies where the plaintiff inmate filed a grievance but failed to file an appeal); see also Cole v. Irby, 181 Fed. Appx. 392, 393-94 (5th Cir. 2006) (affirming dismissal of complaint for failure to exhaust administrative remedies where inmate alleged that he filed a grievance but did not sufficiently allege that he attempted to comply with the appeal requirements); Wright v. Hollingsworth, 260 F.3d 357, 358 (5th Cir. 2001) (holding that inmate's failure to "pursue the

grievance remedy to conclusion" barred his lawsuit); Jernigan v. Stuchell, 304 F.3d 1030, 1032 (10th Cir. 2002) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies.").

Second, the Plaintiff has not alleged that he pursued any grievance through the State Board of Adjustment.  See Brown v. Tombs, 139 F.3d 1102, 1103-04 (6th Cir. 1998) (requiring prisoners to affirmatively show that they have exhausted administrative remedies).  In addition to the grievance procedure at the local level, Alabama law provides the opportunity to file a claim and proceed before the State of Alabama Board of Adjustment pursuant to Ala. Code § 41-9-60. The Sheriff of Lee County is a state officer, as are his alter egos, and therefore, they would be entitled to sovereign immunity.  See Lancaster, 116 F.3d at 1429.  Due to this immunity, the State of Alabama has provided an administrative remedy for the recovery of money damages through the State of Alabama Board of Adjustment.

As a result of Plaintiff's failure to exhaust these two remedies, he is barred from bringing this action under § 1997e(a).  See Alexander v. Hawk, 159 F.3d 1321, 1326-27 (11th Cir. 1998) (affirming dismissal of prison action due to failure to exhaust administrative remedies, stating that the judicially recognized futility and inadequacy exceptions that existed under former § 1997e(a) are not applicable under the new mandatory exhaustion requirement of the PLRA); Booth v. Churner, 532 U.S. 731, 741 (2001) (concluding that the exhaustion of administrative remedies is now mandatory and courts cannot excuse exhaustion).

        **2.**      **The Plaintiff's claims are barred by the Prison Litigation Reform Act because he did not allege that he suffered any physical injury as a result of the allegations in his Complaint.**

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury . . . .  In order to avoid

18

dismissal under § 1997e(e), a prisoner's claims for emotional or mental injury must be accompanied by allegations of physical injuries that are greater than de minimis."

Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309 (11th Cir. 2002). The Plaintiff did not allege any physical injury in his Complaint. Further, the evidence shows that the Plaintiff did not sustain any physical injury that is greater than de minimis as a result of any of the allegations made the basis of his Complaint. Accordingly, his Complaint is due to be dismissed

C.    **The Defendants are entitled to summary judgment based on qualified immunity because nothing in their conduct crossed a "bright line" contour of clearly established constitutional law.**

The Defendants were acting within their discretionary authority as Sheriff and Detention Center officials of Lee County during all times relevant to the Plaintiff's Complaint because all their actions were taken in the furtherance of their job duties. See, e.g. Holloman ex rel. Holloman v. Harland, 370 F.3d 1252, 1267 (11th Cir. 2004). Once a defendant has asserted the defense of qualified immunity and shown that he was acting within his discretionary authority, the threshold inquiry a court must undertake is whether the plaintiff's allegations, if true, establish a constitutional violation. Saucier v. Katz, 533 U.S. 194, 201 (2001). This initial inquiry is whether "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" Id. (citing Siegert v. Gilley, 500 U.S. 226, 232 (1991)). The second inquiry is, if a constitutional violation is stated, were these rights "clearly established" to the degree that the Defendants had "fair warning" that their conduct violated the Plaintiff's constitutional rights? Willingham v. Loughnan, 321 F.3d 1299, 1301 (11th Cir. 2003).

In making an assessment of whether the particular conduct of the Defendants was clearly established as being violative of constitutional dictates, the reviewing court must examine the state

of law at the time the alleged deprivation occurred.  See Rodgers v. Horsley, 39 F.3d 308, 311 (11th Cir. 1994).  A constitutional right is clearly established only if its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987); Lancaster, 116 F.3d at 1424.  "In this circuit, the law can be 'clearly established' for qualified immunity purposes only by decisions of the U.S. Supreme Court, Eleventh Circuit Court of Appeals, or the highest court of the state where the case arose." Jenkins v. Talladega Bd. of Educ., 115 F.3d 821, 827 (11th Cir. 1997) (en banc) (citations omitted).

### 1.    The Plaintiff's Constitutional Rights were not violated.

#### a.    Excessive Force

The standard used in analyzing excessive force claims based on the Fourteenth Amendment has been described by the United States Supreme Court as follows:  "whether force was applied in a good faith effort to maintain or restore discipline or maliciously or sadistically for the very purpose of causing harm."  Whitley v. Albers, 475 U.S. 312, 320-21 (1984); Bozeman v. Orum, 422 F.3d 125 (11th Cir. 2005).  In Hudson v. McMillian, the United States Supreme Court reasoned:

> [C]orrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmate. . . .  Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

503 U.S. 1, 6 (1992) (citations omitted).  The factors to be considered in evaluating whether the use of force was wanton and unnecessary include: 1) the need for application of force; 2) the relationship between the need and the amount of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate.  Whitley v. Albers, 475 U.S. at 1085.

20

"The infliction of pain in the course of a prison security measure . . . does not amount to cruel and unusual punishment simply because it may appear in retrospect that the degree of force authorized or applied for security purposes was unreasonable, and hence unnecessary in the strict sense." Whitley v. Albers, 475 U.S. 312, 319 (1986).[9] In evaluating the challenged conduct of jail officials, a court must keep in mind the paramount concerns of maintaining order and discipline in an often dangerous and unruly environment. Ort v. White, 813 F.2d 318, 322 (11th Cir. 1987).

> Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. . . . That deference extends to prison security measure taken in response to an actual confrontation with riotous inmates, just as it does to prophylactic or preventive measures intended to reduce the incidence of these or any other breaches of prison discipline.

Whitley, 475 U.S. at 321-22. "[T]he courts give great deference to the actions of prison officials in applying prophylactic or preventive measures intended to reduce the incidence of riots and other breaches of prison discipline." Williams v. Burton, 943 F.2d 1572, 1576 (11th Cir. 1991). "When the 'ever-present potential for violent confrontation and conflagration,' . . . ripens into *actual* unrest and conflict, the admonition that 'a prison's internal security is peculiarly a matter normally left to the discretion of prison administrators,' . . . carries special weight." Whitley, 475 U.S. at 321 (emphasis in original). In Whitley v. Albers, 475 U.S. 312, 319 (1986), the court held that the "shooting [of an inmate in the leg] was part and parcel of a good-faith effort to restore prison security . . . [and] did not violate respondent's Eighth Amendment right to be free from cruel and unusual punishments."

---

[9] The Supreme Court of the United States has recognized that "not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." Graham v. Connor, 490 U.S. 386, 396 (1989); see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citing same principle in reference to excessive force claim in a prison context).

In the instant case, the only physical contact occurred when Officer Aaron tapped the Plaintiff to get his attention so that he could verify his identity for purposes of headcount. The evidence is clear that Officer Aaron did not push, touch, or in any way cause the Plaintiff to fall. In fact Officer Aaron as well as two of the Defendants witnessed him fake his fall.

The amount of force used – one tap – was the minimum amount of force necessary to get the Plaintiff's attention and was therefore proportionate to the need for the force. The Plaintiff was threatening the secure operations of the jail by interfering with head count. Officer Aaron attempted to temper the severity of the forceful response by only tapping the Plaintiff. Finally, there are insufficient allegations to show that the Plaintiff sustained *any* injuries as a result of the small tap. Clearly, in the instant case, the minimal force used was in a good faith effort to restore discipline, not maliciously or sadistically for the very purpose of causing harm.

Even if the Plaintiff's allegations were believed – that Officer Aaron pushed him – this force would still not be excessive. The Plaintiff was acting belligerently and continued to make derogatory remarks as the officers led him down the hall. Such malfeasance clearly presented a threat to the security of the institution and warranted the alleged force. Even if, in hindsight, a push was unnecessary, it does not rise to the level of a constitutional violation. See, e.g., Graham v. Connor, 490 U.S. 386, 396 (1989) ("[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."; see also Hudson v. McMillian, 503 U.S. 1, 9 (1992) (citing same principle in reference to excessive force claim in a prison context).

Further, *de minimus* uses of force cannot support a claim for a constitutional violation "provided that the use of force is not of a sort repugnant to the consciences of mankind." Hudson v. McMillian, 503 U.S. 1, 9-10 (1993) (internal quotation marks omitted). It is obvious

22

that the force used in the instant case was a *de minimus* use of force and not repugnant to the consciences of mankind. Officer Aaron only tapped Plaintiff to get his attention so that he could verify his identity. Even if the Plaintiff's allegation that Officer Aaron pushed him were believed, such force still is de minimus. Accordingly, the Plaintiff cannot make out a claim for a constitutional violation.

### b.    Due Process

The Plaintiff's disciplinary segregation for ten days does "not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Sandin v. Conner, 515 U.S. 472, 486 (1995) (holding that 30 days of disciplinary segregation did not trigger due process protections); see also Flynn v. Scott, 2006 WL 1236718, *3 (M.D.Ala. 2006) (granting defendants summary judgment because the inmate's "temporary loss of privileges, his assignment to disciplinary segregation for forty-five days, and his referral to classification for a reclassification hearing, do not represent a "dramatic departure" from the ordinary conditions of confinement"); Taylor v. Naphcare, Inc., 2006 WL 2038428, *11 (M.D.Ala. 2006) (holding that the inmate's "placement on segregation, without more, 'does not represent a dramatic departure from the basic conditions' of the sentence imposed upon him" and therefore he had "no entitlement to due process in connection therewith.") Because the Plaintiff was not deprived of any liberty interest in this case, he was not entitled to any procedural due process protections.

Even though not required, the Defendants afforded the Plaintiff procedural due process. The United States Supreme Court held that procedural due process requires written notice of the charges and at least 24 hours between the notice and the hearing. Wolff v. McDonnell, 418 U.S. 539, 563-64 (1974). "[T]he inmate facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will

23

not be unduly hazardous to institutional safety or correctional goals."  418 U.S. at 566.  The Plaintiff acknowledges that he was given notice and a hearing and that he was allowed to call witnesses in his defense.  Clearly, the Plaintiff was given due process in this case even though it was not required.

Further, any procedural due process claims are due to be dismissed because the Plaintiff has failed to allege that state law provides him no adequate remedy.  "[P]rocedural due process violations do not even exist unless no adequate state remedies are available."  Cotton v. Jackson, 216 F.3d 1328, 1331 n.2 (11th Cir. 2000).  "Plaintiff's procedural due process claim is due to be dismissed because [he] has failed to allege that the State does not provide adequate procedures to remedy the alleged procedural deficit, and the Court finds that the State of Alabama provides a remedy for this type of contract action."  R.E. Grills Const. Co., Inc. v. Ala. Dep't of Transp., 198 F. Supp. 2d 1297, 1301 (N.D. Ala. 2002) (citing Cotton, 216 F.3d at 1331); see also Tinney v. Shores, 77 F.3d 378, 382 (11th Cir. 1996) ("Under Parratt and Hudson, the Tinneys have failed to state a valid procedural due process claim because they have not alleged that Alabama law provided them with an inadequate post-deprivation remedy.").  Because the Plaintiff has not alleged that no state post-deprivation remedies are available, any procedural due process claims are due to be dismissed.

Accordingly, the Plaintiff's due process claims are due to be dismissed.

### c.    Conditions of Confinement

In order to establish a conditions of confinement claim Plaintiff "must prove three elements:  (1) a condition of confinement that inflicted unnecessary pain or suffering constituting cruel and unusual punishment, (2) the defendants' deliberate indifference to that condition, and (3) causation.  Rhodes v. Chapman, 452 U.S. 337, 347 (1981) (first element); Wilson v. Seiter, 502 U.S. 294, 303 (1991) (second element); Williams v. Bennett, 689 F.2d 1389-90 (11th Cir.

1982) (third element).   Whether a particular condition of confinement constitutes cruel and unusual punishment is an objective inquiry; whether jail officials were deliberately indifferent to that condition is a subjective inquiry.   Wilson v. Seiter, 502 U.S. at 290.   In the instant case, the Plaintiff cannot establish either the objective or subjective components of his conditions of confinement claims.

### (a)    Objective Component

With regard to the objective component, the Eleventh Circuit has held that "*extreme* deprivations are required to make out a conditions-of-confinement claim" under the Eighth Amendment.   Chandler v. Crosby, 379 F.3d 1278, 1298 (11th Cir. 2004) (emphasis in original). "[A] constitutional violation occurs only where the deprivation alleged is, objectively, 'sufficiently serious.'"   Farmer v. Brennan, 511 U.S. 825, 834 (1994).   "[T]he Constitution does not mandate comfortable prisons."   Chandler, 379 F.3d. at 1289.

In the instant case, the Plaintiff cannot present evidence of any "*extreme*" deprivation that could be objectively considered "cruel and unusual."   It is clear that the conditions alleged in the Plaintiff's Complaint were not "extreme" as to rise to the level of a constitutional violation.   The Plaintiff alleges that his lockdown cell was unsanitary; that he was only allowed 15 minutes out of the cell to take a shower; that there are bugs in the shower area; that the shower area is unsanitary; and that he only has access to laundry every few days.   However, the Defendants have shown that the Plaintiff had access to cleaning materials on a twice daily basis to clean his cell, and that the shower areas are cleaned daily as well as being cleaned regularly with a steam sanitizer. Further, the Lee County Detention Center officials follow sound policies and procedures to present insect infestation.   Finally, inmate clothing, linens, and blankets are laundered regularly.

Accordingly, the clear evidence shows that the Plaintiff was not ever subjected to objectively severe conditions.

Conditions such as those alleged by the Plaintiff have been held to not be objectively serious enough to rise to the level of a constitutional violation. See, e.g., Taylor v. Naphcare, Inc., 2006 WL 2038428, *6 (M.D. Ala. 2006) (stating that the plaintiff's "claims that black mold, vermin, and mice were present in the dining hall, dishroom, and dormitories . . . , that mattresses and pillows were worn-out and seldom washed, that insect and vermin waste were found in the food . . . and that the shower facilities were not clean" did not rise to the level of a constitutional violation); Wilson v. Blankenship, 163 F.3d 1284, 1293 (11th Cir. 1998) (holding no constitutional violation where, although inmate could not exercise outdoors, they "presented no documented reason that he could not have engaged in indoor exercise."); Harris v. Fleming, 839 F.2d 1232 (7th Cir. 1988) (denial of outdoor exercise for four weeks is not a constitutional violation where inmate could have improvised temporarily by exercising in his cell); McClung v. Camp County, Tex., 627 F. Supp. 528, 532 (E.D. Tex. 1986) (upholding weekly laundry service as constitutional); Oliver v. Powell, 250 F. Supp. 2d 593, 604 (E.D. Va. 2002) (holding that being "placed in a segregation cell with roaches, leaky toilets, peeling paint, and writing on the wall" did not rise to the level of a constitutional violation). Further, the Plaintiff only alleges that he was subjected to these conditions during his time on disciplinary status – 10 or 11 days. The short duration of the alleged conditions cannot rise to the level of a constitutional violation. See Dixon v. Toole, 2006 WL 1038433, *5, n. 8 (S.D. Ga. 2006) ("[S]hort periods of incarceration in unsanitary conditions are generally insufficient to evidence an Eighth Amendment violation."); White v. Nix, 7 F.3d 120, 121 (8th Cir. 1993) (stating that "considering the relative brevity of White's [11-day] stay in cell I-1 [which the plaintiff claimed was unsanitary], no Eighth Amendment violation occurred");

26

Hamilton v. Peters, 919 F. Supp. 1168 (N.D. Ill. 1996) (holding that "denying a prisoner regular showers and ample supplies of toiletries for a finite period, such as twenty-eight days, does not demonstrate a deprivation of the 'minimal civilized measure of life's necessities'"); Martin v. Lane, 766 F. Supp. 641, 648 (N.D. Ill.1991) (holding that a deprivation of hygienic supplies for between three to eighteen days is not a violation of an inmate's constitutional rights); Gilland v. Owens, 718 F. Supp. 665, 685 (W.D. Tenn. 1989) ("Short term deprivations of toilet paper, towels, sheets, blankets, mattresses, toothpaste, toothbrushes and the like do not rise to the level of a constitutional violation.").

Therefore, even if the Plaintiff's allegations were taken as true without consideration to the Defendants' evidence, his allegations to not rise to the level of a constitutional violation.

### (b)    Subjective Component

Even if the Plaintiff's conditions of confinement were objectively "cruel and unusual," there must still be evidence of subjective deliberate indifference on the part of each Defendant. "To be deliberately indifferent, a [jail] official must knowingly or recklessly disregard an inmate's basic needs." LaMarca v. Turner, 995 F.2d 1526, 1535 (11th Cir. 1993). "[A] plaintiff must prove that the official possessed knowledge both of the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" Id. (quoting Duckworth v. Franzen, 780 F.2d 645, 653 (7th Cir. 1985), cert. denied, 479 U.S. 816 (1986). There must be evidence that the official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Farmer v. Brennan, 511 U.S. at 837; see also Geder v. Godinez, 875 F. Supp. 1334, 1341-42 (N.D. Ill. 1995) (granting summary judgment to

defendants where the plaintiff failed to show deliberate indifference to "defective pipes, sinks, and toilets, improperly-cleaned showers, a broken intercom system, stained mattresses, accumulated dust and dirt, and infestation by roaches and rats").  The United States Supreme Court equates the level of culpable intent required to the standard employed in the context of *criminal* recklessness prosecutions.  Id. at 837-39.  No liability can be attributed to "an official's failure to alleviate a significant risk which he should have perceived but did not."  Cottrell v. Caldwell, 85 F.3d 1480, 1491 (11th Cir. 1996).

In the instant case, even if there were an excessive risk to his health or safety, the Plaintiff has not alleged that any of the Defendants knew of or disregarded that risk.  The Plaintiff does not allege that *any* of the Defendants was aware that his cell or shower area was unsanitary or that there were insects in his cell.  Further, none of the Defendants received any request form regarding this issue from the Plaintiff.  Because the Plaintiff cannot meet the objective or subjective tests as set forth in Farmer, *supra*, his claims are due to be dismissed.

Furthermore, the United States Supreme Court has held that a significant injury is required in order to sustain a conditions of confinement claim.  Porter v. Nussle, 534 U.S. 516, 528 (U.S.2002) ("[T]o sustain a [conditions of confinement] claim, "significant injury" must be shown; Boxer X v. Harris, 437 F.3d 1107, 1111 (11th Cir. 2006) ("[U]nder our circuit precedent about the nature of actionable injuries under the Eighth Amendment, an injury can be 'objectively, sufficiently serious' only if there is more than de minimis injury."); see also Smith, 87 F.3d at 268 (noting that the plaintiff "did not allege that he was exposed to disease or suffered any other consequences of the exposure [to raw sewage]" and finding a de minimus imposition that did not amount to a constitutional violation), citing Bell v. Wolfish, 441 U.S. 520, 539 n.21 (1979) ("There is, of course, a de minimis level of imposition with which the Constitution is not

28

concerned.").  The Plaintiff has not alleged that he suffered ***any*** injury as a result of the alleged conditions of his confinement.    Accordingly, the Plaintiff cannot sustain a conditions of confinement claim.

### d.    Access to Courts

The Plaintiff has not alleged any facts sufficient to maintain a claim that he suffered a constitutional deprivation due to any alleged denial of access to courts.

> "[T]he fundamental constitutional right of access to the courts requires prison authorities to . . . provid[e] prisoners with adequate law libraries or adequate assistance from persons trained in the law."  The Supreme Court, however, has clarified that prisoners' contentions of deprivations of access to courts must show actual injury as a "constitutional prerequisite."  While *Bounds* guarantees the right of access to the courts under the Fourteenth Amendment, prisoners have no inherent or independent right of access to a law library or to legal assistance. Instead, they must show actual injury in the pursuit of specific types of nonfrivolous cases: direct or collateral attacks on sentences and challenges to conditions of confinement.  "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration."

Wilson v. Blankenship, 163 F.3d 1284, 1290 (11th Cir. 1998) (internal citations omitted).

In Lewis v. Casey, the United States Supreme Court made it clear that, in order to prevail on a claim that an inmate's right to access to courts has been violated, the inmate must establish prejudice by "demonstrat[ing] that the alleged shortcoming in the library or legal assistance program [or other alternative provided] hindered his efforts to pursue a legal claim."  Lewis v. Casey, 116 S. Ct. 2174 (1996).  To establish such prejudice, an inmate must "show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known, or that he suffered arguably, actionable harm that he wished to bring before the courts,

but was so stymied by inadequacy of the law library that he was unable to even file a Complaint." Id.

The Plaintiff in this case has failed to allege that he was, in any way, prejudiced, in any manner whatsoever, in any court. The Plaintiff's criminal case had been disposed of by his guilty plea prior to his being placed on disciplinary status. Therefore, his criminal matter could not have been prejudiced. Further, it is clear that, in the instant civil matter, Plaintiff was able to file his Complaint with this Court even though he was on disciplinary status.

Furthermore, the evidence shows that the Lee County Sheriff's Office allows inmates to have access to the courts, attorneys, and their authorized representatives as well as materials from the law library. Inmates are entitled to privileged visits at any reasonable time with their attorneys or other legal official. The Plaintiff, despite being placed on disciplinary status, had access to mail, and therefore, he was able to communicate with the courts and/or his attorney throughout the ten day disciplinary period.

In conclusion, the evidence shows that the Plaintiff was not, in fact, denied access to courts, and even so, the Plaintiff has failed to allege a required element of an access to courts claim – that he was prejudiced by such denial. Accordingly, Plaintiff's access to courts claim must fail.

## 2. No clearly established law provided the Defendants with fair warning that their conduct was unlawful.

Assuming, *arguendo*, that the Plaintiff could demonstrate a constitutional violation, he must still show that clearly established law provided the Defendants with fair warning that their conduct was unlawful. He may do so by either (1) pointing to a case with materially similar facts holding that the conduct engaged in was illegal; or (2) demonstrating that a pertinent federal statute or

federal constitutional provision are specific enough to demonstrate conduct was illegal, even in the total absence of case law. Storck v. City of Coral Springs, 354 F.3d 1307, 1317 (11th Cir. 2003) (citations omitted). The Eleventh Circuit has identified the latter method as an "obvious clarity" case. Vinyard v. Wilson, 311 F.3d 1340, 1350 (11th Cir. 2002) (footnote omitted). In order to show that the conduct of the Defendant was unconstitutional with "obvious clarity," "the unlawfulness must have been apparent." Willingham, 321 F.3d at 1301. "Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." Storck, 354 F.3d at 1318 (quoting 28 F.3d at 1149).

The Plaintiff cannot meet his burden of demonstrating a constitutional violation or showing that clearly established law provided the Defendants with fair warning that their conduct was unlawful in any of the areas of which the Plaintiff complains. Therefore, the Defendants are entitled to qualified immunity.

**D.    The Plaintiff has failed to allege sufficient personal involvement on each claim.**

The language of 42 U.S.C. § 1983 requires proof of an affirmative causal connection between the actions taken by the defendants and the constitutional deprivation. Swint v. City of Wadley, 51 F. 3d 988 (11th Cir. 1995). The requisite causal connection may be shown by the personal participation of the defendant, a policy established by the defendant resulting in deliberate indifference to constitutional rights or a breach of a duty imposed state of local law which results in constitutional injury. Zatler v. Wainwright, 802 F. 2d 397, 401 (11th Cir. 1986).

The Plaintiff does not allege that Major Torbert, Lieutenant Roberson, Lieutenant Welch, or Sergeant Threat used excessive force against him. The Plaintiff does not allege that Major Torbert,

Lieutenant Roberson, Lieutenant Welch, or Officer Aaron were involved in the disciplinary hearing. The Plaintiff does not allege that Major Torbert, Lieutenant Roberson, Sergeant Threat, or Officer Aaron were involved in the alleged denial of a telephone call to the Plaintiff's attorney. Finally, the Plaintiff does not allege that any of the Defendants were personally involved in the alleged sanitation issues. Accordingly, these claims are due to be dismissed as to those Defendants to whom the Plaintiff fails to make allegations. In fact, Major Torbert and Lieutenant Roberson are due to be completely dismissed from this action because there are *no* factual allegations against them.

The lack of factual allegations against the Defendants make it clear that the Plaintiff is attempting to hold the Defendants liable on the theory of *respondeat superior*. To the extent that the Plaintiff's claims are an attempt to hold the Defendants liable under a *respondeat superior* theory, his claim must similarly fail. See <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658, 691 (1978). The Eleventh Circuit in <u>Hartley v. Parnell</u>, 193 F.3d 1263 (11th Cir. 1999), established exactly what is required to state a claim (or prove) supervisory liability:

> Supervisory liability [under § 1983] occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between actions of the supervising official and the alleged constitutional deprivation. The causal connection can be established when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so. The deprivations that constitute widespread abuse sufficient to notify the supervising official must be "obvious, flagrant, rampant and of continued duration, rather than isolated occurrences." <u>Brown v. Crawford</u>, 906 F.2d 667, 671 (11th Cir. 1990) (citations omitted).

193 F.3d at 1269. The causal connection may also be established where the supervisor's improper "custom or policy . . . result[s] in deliberate indifference to constitutional rights." <u>Rivas v. Freeman</u>, 940 F.2d 1491, 1495 (11th Cir. 1991) (citing <u>Zatler v. Wainwright</u>, 802 F.2d

397 (11th Cir. 1986)).  In light of the applicable law, the Plaintiff's allegations are insufficient to create liability on the part of the Defendants.  As such, Plaintiff's claims are due to be dismissed against all the Defendants.

### E.    Summary Judgment Standard

On a motion for summary judgment, the court should view the evidence in the light most favorable to the nonmovant.  Greason v. Kemp, 891 F.2d 829, 831 (11th Cir. 1990).  However, a plaintiff "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Only reasonable inferences with a foundation in the record inure to the nonmovant's benefit.  See Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000).  "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted or unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  Reeves, 530 U.S. at 151, quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 299.[10]  "A reviewing court need not 'swallow plaintiff's invective hook, line and sinker; bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like need not be credited.'"  Marsh v. Butler County, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001) (en banc) quoting Massachusetts Sch. of Law v. American Bar, 142 F.3d 26, 40 (1st Cir. 1998).

---

[10] Although Reeves was a review of a motion for judgment as a matter of law after the underlying matter had been tried, the Supreme Court, in determining the proper standard of review relied heavily on the standard for summary judgment stating, "the standard for granting summary judgment 'mirrors' the standard for judgment as a matter of law, such that 'the inquiry under each is the same.'"  Reeves, 530 U.S. at 150, citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## CONCLUSION

The Defendants deny each and every allegation made by the Plaintiff Sharoderick Anton Smith in the Complaint. The Defendants have not acted in a manner so as to deprive the Plaintiff of any right to which he is entitled.

## MOTION FOR SUMMARY JUDGMENT

The Defendants respectfully request that this Honorable Court treat their Special Report as a Motion for Summary Judgment, and grant unto them the same.

Respectfully submitted this 4th day of December, 2006.

**s/Amanda Kay Morgan**
AMANDA KAY MORGAN (ALL079)
Attorney for Defendants
WEBB & ELEY, P.C.
7475 Halcyon Pointe Drive (36117)
Post Office Box 240909
Montgomery, Alabama  36124
Telephone:  (334) 262-1850
Fax:  (334) 262-1889
E-mail:  amorgan@webbeley.com

## CERTIFICATE OF SERVICE

I hereby certify that on this the **4th** day of **December, 2006**, I have electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and that I have mailed a true and correct copy of the foregoing by United States Mail, postage prepaid, to the following non-CM/ECF participant:

Sharoderick Anton Smith
199528
Lee County Detention Center
P.O. Box 2407
Opelika, AL 36803-2407

**s/Amanda Kay Morgan**
OF COUNSEL

34

**Exhibit A**
**Inmate File of Sharoderick Anton Smith**
**Booking Sheet dated July 19, 2004**

```
                          LEE COUNTY SHERIFF'S OFFICE
07/19/2006    10:24:41        INMATE BOOKING SHEET                    PAGE    1
=============================================================================
BOOKING NO: 060003482

INMATE NAME: SMITH SHARODERICK ANTON              RACE: B        SEX: M
       ALIAS:                                     HT: 6'01"  HAIR: BLK
       ALIAS:                                     WT: 140    EYES: BRO
     ADDRESS: 597 LEE RD 001                      COMPLEX:
 CITY/ST/ZIP: NOTASULGA, AL 36830                 SSN:
  HOME PHONE: 334-                                DL ST: AL    DLN:
         DOB:              AGE: 25                SID:
  PLCE BIRTH: OPELIKA                             LOCID: 16866
       STATE: AL
   M. STATUS: SINGLE
    RELIGION: NA
  GANG ASSOC: NA
SCARS/TATTOOS: ANGELA RIGHT ARM RIP RIGHT ARM THUG LIFE ON CHEST
KNOWN ENEMIES: NONE
     REMARKS:
------------------------------- NEXT OF KIN ---------------------------------
 NEXT OF KIN: ANGELA SMITH              RELATIONSHIP: MOTHER
     ADDRESS: 597 LEE RD 1                      PHONE:
 CITY/ST/ZIP: AUBURN, AL
     REMARKS: 334-2       7
----------------------------- EMPLOYER INFO ---------------------------------
    EMPLOYED: Y
EMPLOYER NAME: WENDYS
     ADDRESS:
 CITY/ST/ZIP: AUBURN,
       PHONE: 000-000-0000
------------------------------- MEDICAL -------------------------------------
  HANDICAPPED: N  NEEDS: NONE
     GLASSES: N  SMOKE: Y
MEDICAL NEEDS: Y  NEEDS: BACK PAIN AND HEAD PAIN
   PHYSICIAN:                     PHONE: 000-000-0000
     REMARKS:

     REMARKS:
     REMARKS:
------------------------------- PROPERTY ------------------------------------
        CASH:      $00.00
 DESCRIPTION:
ADD. PROPERTY: HAT, BELT
ADD. PROPERTY:
ADD. PROPERTY:    #37
  BIN NUMBER:
VEH IMPOUNDED:
 IMPOUND LOT:
     REMARKS:
     REMARKS:
=============================================================================
I HAVE READ THE ABOVE ACCOUNTING OF MY PERSONAL INFORMATION, MEDICAL
INFORMATION, MONEY, AND OTHER PROPERTY AND I FIND IT TO BE TRUE AND ACCURATE.

INMATE: X Sharoderick Smith  DATE: 7/19/06   TIME: 10:40

BOOK OFFICER: DBlack          DATE: 7/19      TIME: 1038
```

```
                        LEE COUNTY SHERIFF'S OFFICE          PAGE    2
                            INMATE BOOKING SHEET
07/19/2006      10:24:41
============================================================================
BOOKING NO: 060003482        INMATE NAME: SMITH SHARODERICK ANTON
============================================================================
                                     ATTORNEY ON REC: NA
        COURT:                             PHONE: 000-000-0000
        JUDGE:
      REMARKS:
      REMARKS:
----------------------------------------------------------------------------
    BOOK DATE: 07/19/2006   BOOK TIME: 10:15   BOOK TYPE: NORMAL

  ARREST DATE: 07/19/2006          BOOKING OFFICER: BLACK
  ARREST DEPT: LCSO                CELL ASSIGNMENT: HC3
 ARRST OFFICER: MAJORS                  MEAL CODE: 01   LEE COUNTY
PROJ. RLSDATE: 00/00/0000               FACILITY: 01   COUNTY JAIL
 SEARCH OFFCR: SANDERS             CLASSIFICATION:
  TYPE SEARCH:                       WORK RELEASE: N
INTOX RESULTS:


        HOLDS: N
       AGENCY:                    REASON:
       AGENCY:                    REASON:
       AGENCY:                    REASON:
       AGENCY:                    REASON:


        NOTES:
        NOTES:
        NOTES:
```

```
                             LEE COUNTY SHERIFF'S OFFICE
07/19/2006      10:24:41        INMATE CHARGE SHEET                    PAGE  - 3
===============================================================================
BOOKING NO: 060003482      INMATE NAME: SMITH SHARODERICK ANTON
===============================================================================
  CHARGE NO:   1  DISPOSITION: OPEN              HOLD: N
```

ALA STATUTE: CC98-477                    # OF COUNTS:    1
    OFFENSE: FTA/BURG II                   WARRANT #:
      CASE #:
    BOND AMT: 0                               FINE:        $0.00
    BAIL AMT:
 INIT APPEAR: 00/00/0000            SENTENCE DATE: 00/00/0000
 RELEASE DTE: 00/00/0000
 ARREST DATE: 07/19/2006              ARST AGENCY: LCSO
 ARST OFFICR: MAJORS                      COUNTY:
       COURT:                              JUDGE: DENSON
 DEF ATTORNY:                        DIST ATTORNEY:
    COMMENTS:
    COMMENTS:
    COMMENTS:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
  CHARGE NO:   2  DISPOSITION: OPEN              HOLD: N

ALA STATUTE: CC98-478.00                  # OF COUNTS:    1
    OFFENSE: FTA/TOP II                    WARRANT #:
      CASE #:
    BOND AMT: 0                               FINE:        $0.00
    BAIL AMT:
 INIT APPEAR: 00/00/0000            SENTENCE DATE: 00/00/0000
 RELEASE DTE: 00/00/0000
 ARREST DATE: 07/19/2006              ARST AGENCY: LCSO
 ARST OFFICR: MAJORS                      COUNTY:
       COURT:                              JUDGE: DENSON
 DEF ATTORNY:                        DIST ATTORNEY:
    COMMENTS:
    COMMENTS:
    COMMENTS:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
  CHARGE NO:   3  DISPOSITION: OPEN              HOLD: N

ALA STATUTE: CC03-1266.00                 # OF COUNTS:    1
    OFFENSE: FTA/DWS                       WARRANT #:
      CASE #:
    BOND AMT: 0                               FINE:        $0.00
    BAIL AMT:
 INIT APPEAR: 00/00/0000            SENTENCE DATE: 00/00/0000
 RELEASE DTE: 00/00/0000
 ARREST DATE: 07/19/2006              ARST AGENCY: LCSO
 ARST OFFICR: MAJORS                      COUNTY:
       COURT:                              JUDGE: DENSON
 DEF ATTORNY:                        DIST ATTORNEY:
    COMMENTS:
    COMMENTS:
    COMMENTS:
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
```

```
                              LEE COUNTY SHERIFF'S OFFICE
07/19/2006      10:24:41         INMATE CHARGE SHEET                      PAGE    4
===================================================================================
BOOKING NO: 060003482      INMATE NAME: SMITH SHARODERICK ANTON
===================================================================================
 CHARGE NO:    4  DISPOSITION: OPEN                    HOLD: N
-----------------------------------------------------------------------------------

ALA STATUTE: CC06-396.00              # OF COUNTS:    1
    OFFENSE: FTA/POSS CONT SUB        WARRANT #:
       CASE #:
     BOND AMT: 0                          FINE:        $0.00
     BAIL AMT:
  INIT APPEAR: 00/00/0000         SENTENCE DATE: 00/00/0000
  RELEASE DTE: 00/00/0000
  ARREST DATE: 07/19/2006           ARST AGENCY: LCSO
  ARST OFFICR: MAJORS                   COUNTY:
        COURT:                           JUDGE: WALKER
  DEF ATTORNY:                     DIST ATTORNEY:
     COMMENTS:
     COMMENTS:
     COMMENTS:
-----------------------------------------------------------------------------------
  CHARGE NO:    5  DISPOSITION: OPEN                   HOLD: N

ALA STATUTE: CC06-396.01              # OF COUNTS:    1
    OFFENSE: FTA/POSS DEUG PARAH      WARRANT #:
       CASE #:
     BOND AMT: 0                          FINE:        $0.00
     BAIL AMT:
  INIT APPEAR: 00/00/0000         SENTENCE DATE: 00/00/0000
  RELEASE DTE: 00/00/0000
  ARREST DATE: 07/19/2006           ARST AGENCY: LCSO
  ARST OFFICR: MAJORS                   COUNTY:
        COURT:                           JUDGE: WALKER
  DEF ATTORNY:                     DIST ATTORNEY:
     COMMENTS:
     COMMENTS:
     COMMENTS:
-----------------------------------------------------------------------------------
```

**Exhibit B**
**Inmate File**
**Conviction Report dated July 21, 2006**

ACR359

ALABAMA JUDICIAL DATA CENTER
LEE COUNTY
TRANSCRIPT OF RECORD
CONVICTION REPORT

CC 2006 000396.00 01
HON. JACOB A. WALKER III

---

| CIRCUIT COURT OF LEE COUNTY | COURT ORI: 043015 J |

---

STATE OF ALABAMA         VS.
SMITH SHARODERICK ANTON      ALIAS: ROD
597 LEE RD 001               ALIAS:
LOACHAPOKA   AL   36830

DC NO: GJ 2005 000257.00
G J:   227
SSN:
SID:   000000000
AIS:   000000

---

DOB: ▓▓▓▓▓▓    SEX: M  HT: 5 11    WT: 173  HAIR: BLK  EYE: BRO
RACE: ( )W (X)B ( )O   COMPLEXION: _____  AGE: _____  FEATURES: _____

---

DATE OFFENSE: 00/00/0000  ARREST DATE: 03/03/2005  ARREST ORI: 0430100

---

| CHARGES @ CONV     CITES | CT CL COURT ACTION | CA DATE |
| POSS/REC CONTR. SU 13A-012-212 | 01 C   GUILTY PLEA | 07/21/2006 |
|  | 00 | 00/00/0000 |
|  | 00 | 00/00/0000 |

---

JUDGE: HON. JACOB A. WALKER III    PROSECUTOR: ABBETT NICK

---

PROBATION APPLIED   GRANTED   DATE    REARRESTED DATE   REVOKED   DATE
(X)Y ( )N 07212006 ( )Y ( )N _____  ( )Y( )N _____   ( )Y( )N _____

---

15-18-8, CODE OF ALA 1975   IMPOSED   SUSPENDED   TOTAL   JAIL CREDIT
(X)Y ( )N   CONFINEMENT: 01 00 000  09 00 000  10 00 000  00 00 004
            PROBATION :  04 00 000             04 00 000
DATE SENTENCED: 07/21/2006   SENTENCE BEGINS: 07/21/2006

---

| PROVISIONS | COSTS/RESTITUTION | DUE | ORDERED |
|---|---|---|---|
| HABITUAL OFDR | RESTITUTION | $0.00 | $0.00 |
| SPLIT SENTENC | ATTORNEY FEE | $500.00 | $500.00 |
| DRUG | CRIME VICTIMS | $50.00 | $50.00 |
| JAIL | COST | $274.00 | $274.00 |
|  | FINE | $0.00 | $0.00 |
|  | MUNICIPAL FEES | $0.00 | $0.00 |
|  | DRUG FEES | $1160.00 | $1160.00 |
|  | ADDTL DEFENDANT | $0.00 | $0.00 |
|  | DA FEES | $0.00 | $0.00 |
|  | COLLECTION ACCT | $0.00 | $0.00 |
|  | JAIL FEES | $0.00 | $0.00 |
|  | TOTAL | $1984.00 | $1984.00 |

---

APPEAL DATE        SUSPENDED        AFFIRMED        REARREST

( )Y ( )N _____   ( )Y ( )N _____   ( )Y ( )N _____   ( )Y ( )N _____

---

REMARKS:

THIS IS TO CERTIFY THAT THE
ABOVE INFORMATION WAS EXTRACTED
FROM OFFICIAL COURT RECORDS
AND IS TRUE AND CORRECT.

*Corinne S. Hurst*

CORINNE T. HURST

07/24/2006

---

OPERATOR: LEW
PREPARED: 07/24/2006

Release date
7-17-07

**Exhibit C**
**Affidavit of Major Cary Torbert, Jr.**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| SHARODERICK ANTON SMITH, | ) |
| | ) |
|      Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:06-cv-00834-WKW-VPM |
| | ) |
| LEON AARON, et al., | ) |
| | ) |
|      Defendants. | ) |

## AFFIDAVIT OF CARY TORBERT, JR.

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF LEE | ) |

**BEFORE ME,** the undersigned authority and Notary Public in and for said County and State at large, personally appeared Cary Torbert, Jr., who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.    My name is Cary Torbert, Jr.  I am over the age of nineteen and competent to execute this affidavit.

2.    I serve as chief deputy of corrections of the Lee County Detention Center and have obtained the rank of major.  I have worked with the Lee County Sheriff's Office for over 34 years.

3.    I am familiar with the Plaintiff Sharoderick Anton Smith due to his incarceration in the Lee County Detention Center.

4.    I state affirmatively that I neither acted, nor caused anyone to act, in such a manner as to deprive the Plaintiff of any right to which he was entitled.

5.      Inmate counting procedures are conducted at the change of each shift to ensure the security of the facility.

6.      The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively.

7.      Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility.

8.      All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m. All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list. All inmates are aware of these rules by access to the inmate handbook.

9.      It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation.

10.      It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center.

11.      The Lee County Sheriff's Office operates the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control.

2

12.    When the use of force is necessary, only the minimum amount needed to accomplish the task at hand is used.

13.    Physical force is used only as a last resort.  All reasonable attempts are made to identify and utilize alternative means to deal with the situation.

14.    Physical force or chemical agents may be used in the following incidences:

   a.    Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person.

   b.    In defending one's self or others against any physical assault.

   c.    To prevent the commission of a misdemeanor.

   d.    To prevent serious damage to property.

   e.    To enforce Detention Center regulations

   f.    To prevent or quell a riot.

15.    It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person.

16.    It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing in order to avoid violation of the inmate's right to due process and the arbitrary application of discipline.

17.    The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee who was not directly involved in the incident being reviewed.

3

18.    The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.

19.    The Hearing Board must convene within seven days, excluding weekends and holidays, of the time the inmate was notified of his charges.

20.    Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held.  The inmate may consent to a hearing within less than 24 hours, but he must do so in writing.

21.    An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.

22.    Each side has the right to present witnesses on its own behalf.  The inmate does not have the right to cross-examine witnesses.  The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information.  If the Board denies an inmate's request to present a witness, the reason is documented on the Disciplinary Report.

23.    The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence.  The Board documents reasons for such exclusion on the Disciplinary Report.

24.    Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.

25.    The Hearing Board must find the inmate guilty or not guilty of the charges specified. If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.

4

26.     The Board writes the hearing results on the Disciplinary Report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review. If the inmate is found not guilty, the hearing board must remove the notification of charges form from the inmate's file.

27.     Interfering with lockdowns or counts is a major offense, and profanity or derogatory remarks or gestures to a staff member is a major offense.

28.     If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status. The customary time limit for disciplinary status for a major offense is up to 10 days.

29.     An inmate on Disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.

30.     It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff.

31.     It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment.

5

32.    It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary.

33.    Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily.

34.    The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas.

35.    Each cleaning consists of the following: Floors are swept and mopped. Toilets are scrubbed with toilet cleanser and disinfectant. Sinks and showers are scrubbed with scouring cleanser and disinfectant. Tables and benches are washed. Bunks and sleeping areas are made clean and orderly. Trash receptacles are emptied and washed daily.

36.    The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

37.    The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.

38.    It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.

39.    The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month. A licensed pest control service is contracted to provide control for vermin and insects. Detention Center personnel utilize

6

this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.

40.    Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the chief deputy.

41.    All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.

42.    It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that sanitation and hygiene may be maintained.  All facility issued clothing and linens are laundered according to established schedules.

43.    Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.

44.    All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.

45.    Any inmates on work release have their clothing laundered daily, if necessary.

46.    The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week.  The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week.  Clothing belonging to trusties is laundered on Wednesdays and Saturdays.

47.    Any contaminated clothing is washed separately from all other laundry.

48.    Inmate linens are collected to be laundered at least once each week.

49.    Blankets are laundered at least once each month.

7

50.    It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.

51.    All members of the Detention Center staff make every effort to facilitate private, uncensored communications between inmates and their attorneys.

52.    Members of the Detention Center staff commit no act(s) which will deny or hinder in any way the right of an inmate to have access to the courts.

53.    Written legal materials from inmates which they intend to be carried by the United States mail will be mailed immediately without being opened or read.

54.    Inmates are given access to the telephones in the dayroom each day from 7:00 a.m. until 9:00 p.m.

55.    Telephone privileges are also extended to persons not incarcerated in the dayroom area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and 9:00 p.m.

56.    Inmates are entitled to privileged visits at any reasonable time as determined by the Chief Deputy Sheriff.

57.    Persons incarcerated in the Lee County Detention Center may have access to the Lee County Detention Center Law Library after submitting a written request to the chief deputy sheriff, captain, lieutenant, or shift supervisor.

58.    If possible, the inmate requesting access to the library should make a specific request for materials needed. If this is possible, a member of the Detention Center staff will obtain copies of those materials and return them to the inmate. If not, the inmate will be taken to the library at the next available time.

8

59.    Inmates in segregation who may not visit the library may make requests for specific documents.

60.    It is the policy of the Lee County Sheriff's Office to encourage correspondence between inmates housed in the Lee County Detention Center and those persons in the community who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press.

61.    Inmates may write an unlimited number of letters.    Stamps, writing paper, envelopes, and pencils are available for purchase at the commissary.    Indigent inmates are given enough supplies to write and mail up to three letters each week.

62.    It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the sheriff, chief deputy sheriff, or Detention Center personnel.

63.    Inmates housed in the Lee County Detention Center are furnished with inmate request forms for the purpose of stating their requests or grievances in writing.    Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate.    The officer receiving the request form is to answer the request if possible.    If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered.    If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed.    If the officer to whom the request

9

is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day.

64.     I have never received any request form from the Plaintiff concerning any of the allegations made the basis of his Complaint.

65.     Internal grievance procedures at the Lee County Detention Center are available to all inmates. It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.

66.     All inmates are provided access to a Lee County Detention Center Inmate Handbook. A copy of this handbook is placed in each cellblock for inmates to review whenever they wish. The inmate handbook states that an inmate may report a grievance on an inmate request form. Grievances are first answered by the appropriate staff at the lowest level in the chain of command. The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to the Sheriff, who will make the final decision.

67.     I have never received a grievance from the Plaintiff concerning any of the allegations made the basis of his Complaint. Per Lee County Sheriff's Office policy, an inmate has the opportunity to appeal any grievance to me if he were not satisfied with the response at the lower levels in the chain of command. The Plaintiff has not appealed any grievance to me. Accordingly, the Plaintiff has failed to exhaust his administrative remedies at the Lee County Detention Center.

68.     I have complied with all policies and procedures of the Lee County Detention Center. I am not aware of nor have I authorized or allowed any deviation from said policies and procedures.

10

69.    All Lee County Detention Center records attached to the Special Report are true and accurate copies of jail documents kept by me in the ordinary course of my business. I am the custodian of these records.

70.    I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit and that the above statements were made by drawing from my personal knowledge of the situation.

_____
CARY TORBERT, JR.

**SWORN TO** and **SUBSCRIBED** before me this __4__ day of December 2006.

_____
NOTARY PUBLIC
My Commission Expires: _____

11

# Exhibit D
# Affidavit of Lieutenant Ray Roberson

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| SHARODERICK ANTON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:06-cv-00834-WKW-VPM |
| | ) | |
| LEON AARON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF RAY ROBERSON

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF LEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Ray Roberson, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.     My name is Ray Roberson.  I am over the age of nineteen and competent to execute this affidavit.

2.     I am employed with the Lee County Sheriff's Office and serve as Assistant Jail Administrator at the Lee County Detention Center.  I have worked in the Lee County Detention Center for twenty-three years and have obtained the rank of lieutenant.

3.     I am familiar with the Plaintiff Sharoderick Anton Smith due to his incarceration in the Lee County Detention Center.  However, I have no personal knowledge of any of the facts made the basis of the Plaintiff's Complaint.  I was not involved and did not observe any of the incidents alleged in his Complaint.

4.     ~~I state affirmatively that I neither acted, nor caused anyone to act, in such a~~ manner as to deprive the Plaintiff of any right to which he was entitled.

5.     Inmate counting procedures are conducted at the change of each shift to ensure the security of the facility.

6.     The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively.

7.     Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility.

8.     All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m. All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list. All inmates are aware of these rules by access to the inmate handbook.

9.     It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation.

10.     It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center.

11.     The Lee County Sheriff's Office operates the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control.

2

~~12.    When the use of force is necessary, only the minimum amount needed to accomplish~~
the task at hand is used.

~~13.    Physical force is used only as a last resort.    All reasonable attempts are made to~~
identify and utilize alternative means to deal with the situation.

14.    Physical force or chemical agents may be used in the following incidences:

    a.    Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person.

    b.    In defending one's self or others against any physical assault.

    c.    To prevent the commission of a misdemeanor.

    d.    To prevent serious damage to property.

    e.    To enforce Detention Center regulations.

    f.    To prevent or quell a riot.

15.    It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person.

16.    It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing in order to avoid violation of the inmate's right to due process and the arbitrary application of discipline.

17.    The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee who was not directly involved in the incident being reviewed.

18.    The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.

3

~~19.   The Hearing Board must convene within seven days, excluding weekends and~~ holidays, of the time the inmate was notified of his charges.

20.    Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held.  The inmate may consent to a hearing within less than 24 hours, but he must do so in writing.

21.    An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.

22.    Each side has the right to present witnesses on its own behalf.  The inmate does not have the right to cross-examine witnesses.  The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information.  If the Board denies an inmate's request to present a witness, the reason is documented on the Disciplinary Report.

23.    The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence.  The Board documents reasons for such exclusion on the Disciplinary Report.

24.    Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.

25.    The Hearing Board must find the inmate guilty or not guilty of the charges specified. If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.

26.    The Board writes the hearing results on the Disciplinary Report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review.  If the

4

inmate is found not guilty, the hearing board must remove the Notification of Charges form from the inmate's file.

27. Interfering with lockdowns or counts is a major offense, and Profanity or derogatory remarks or gestures to a staff member is a major offense.

28. If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status. The customary time limit for disciplinary status for a major offense is up to 10 days.

29. An inmate on Disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.

30. It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff.

31. It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment.

32. It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary.

33.    Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily.

34.    The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas.

35.    Each cleaning consists of the following: Floors are swept and mopped. Toilets are scrubbed with toilet cleanser and disinfectant.  Sinks and showers are scrubbed with scouring cleanser and disinfectant. Tables and benches are washed. Bunks and sleeping areas are made clean and orderly. Trash receptacles are emptied and washed daily.

36.    The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

37.    The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.

38.    It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.

39.    The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month.  A licensed pest control service is contracted to provide control for vermin and insects.  Detention Center personnel utilize this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.

40.    Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the Chief Deputy.

6

41. All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.

42. It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that sanitation and hygiene may be maintained. All facility issued clothing and linens are laundered according to established schedules.

43. Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.

44. All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.

45. Any inmates on work release have their clothing laundered daily, if necessary.

46. The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week. The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week. Clothing belonging to trusties is laundered on Wednesdays and Saturdays.

47. Any contaminated clothing is washed separately from all other laundry.

48. Inmate linens are collected to be laundered at least once each week.

49. Blankets are laundered at least once each month.

50. It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.

51. All members of the Detention Center staff make every effort to facilitate private,

7

uncensored communications between inmates and their attorneys.

52.     Members of the Detention Center staff commit no act(s) which will deny or hinder in any way the right of an inmate to have access to the courts.

53.     Written legal materials from inmates which they intend to be carried by the United States mail will be mailed immediately without being opened or read.

54.     Inmates are given access to the telephones in the dayroom each day from 7:00 a.m. until 9:00 p.m.

55.     Telephone privileges are also extended to persons not incarcerated in the dayroom area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and 9:00 p.m.

56.     Inmates are entitled to privileged visits at any reasonable time as determined by the chief deputy sheriff.

57.     Persons incarcerated in the Lee County Detention Center may have access to the Lee County Detention Center Law Library after submitting a written request to the chief deputy sheriff, captain, lieutenant, or shift supervisor.

58.     If possible, the inmate requesting access to the library should make a specific request for materials needed.  If this is possible, a member of the Detention Center staff will obtain copies of those materials and return them to the inmate.  If not, the inmate will be taken to the library at the next available time.

59.     Inmates in segregation who may not visit the library may make requests for specific documents.

60.     It is the policy of the Lee County Sheriff's Office to encourage correspondence between inmates housed in the Lee County Detention Center and those persons in the community

8

who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press.

61.    Inmates may write an unlimited number of letters.   Stamps, writing paper, envelopes, and pencils are available for purchase at the commissary.  Indigent inmates are given enough supplies to write and mail up to three letters each week.

62.    It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the Sheriff, chief deputy sheriff, or Detention Center personnel.

63.    Inmates housed in the Lee County Detention Center are furnished with Inmate Request Forms for the purpose of stating their requests or grievances in writing.  Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate.  The officer receiving the request form is to answer the request if possible.  If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered.  If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed.  If the officer to whom the request is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day.

64.    I have never received any request form from the Plaintiff concerning any of the allegations made the basis of his Complaint.

9

65.    Internal grievance procedures at the Lee County Detention Center are available to all inmates. It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.

66.    All inmates are provided access to a Lee County Detention Center Inmate Handbook. A copy of this handbook is placed in each cellblock for inmates to review whenever they wish. The inmate handbook states that an inmate may report a grievance on an inmate request form. Grievances are first answered by the appropriate staff at the lowest level in the chain of command. The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to the Sheriff, who will make the final decision.

67.    I have never received a grievance from the Plaintiff concerning any of the allegations made the basis of his Complaint. Per Lee County Sheriff's Office policy, an inmate has the opportunity to appeal any grievance to me if he were not satisfied with the response at the lower levels in the chain of command. The Plaintiff has not appealed any grievance to me. Accordingly, the Plaintiff has failed to exhaust his administrative remedies at the Lee County Detention Center.

68.    I have complied with all policies and procedures of the Lee County Detention Center. I am not aware of nor have I authorized or allowed any deviation from said policies and procedures.

10

69.    I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit and that the above statements were made by drawing from my personal knowledge of the situation.


RAY ROBERSON

**SWORN TO** and **SUBSCRIBED** before me this 4 day of December, 2006.


NOTARY PUBLIC
My Commission Expires:_____

12

# Exhibit E
# Affidavit of Lieutenant Corey Welch

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| SHARODERICK ANTON SMITH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:06-cv-00834-WKW-VPM |
| | ) | |
| LEON AARON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF COREY WELCH

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF LEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Corey Welch, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.     My name is Corey Welch. I am over the age of nineteen and competent to execute this affidavit.

2.     I am employed by the Lee County Sheriff's Office and assigned to serve as a corrections officer at the Lee County Detention Center. I have worked as a correctional officer for over ten years, having obtained the rank of Lieutenant in November 2004. I am both a graduate of the Police Academy and the Alabama Jail Management School.

3.     I am familiar with the Plaintiff Sharoderick Anton Smith due to his incarceration in the Lee County Detention Center.

4.     I state affirmatively that I neither acted, nor caused anyone to act, in such a manner as to deprive the Plaintiff of any right to which he was entitled.

5.    Inmate counting procedures are conducted at the change of each shift to ensure the security of the facility.

6.    The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively.

7.    Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility.

8.    All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m. All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list. All inmates are aware of these rules by access to the inmate handbook.

9.    It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation.

10.    It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center.

11.    The Lee County Sheriff's Office operates the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control.

12.    When the use of force is necessary, only the minimum amount needed to accomplish the task at hand is used.

13.    Physical force is used only as a last resort. All reasonable attempts are made to identify and utilize alternative means to deal with the situation.

14.    Physical force or chemical agents may be used in the following incidences:

a.    Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person.

b.    In defending one's self or others against any physical assault.

c.    To prevent the commission of a misdemeanor.

d.    To prevent serious damage to property.

e.    To enforce Detention Center regulations.

f.    To prevent or quell a riot.

15.    It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person.

16.    It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing in order to avoid violation of the inmate's right to due process and the arbitrary application of discipline.

17.    The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee who was not directly involved in the incident being reviewed.

3

18. The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.

19. The Hearing Board must convene within seven days, excluding weekends and holidays, of the time the inmate was notified of his charges.

20. Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held. The inmate may consent to a hearing within less than 24 hours, but he must do so in writing.

21. An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.

22. Each side has the right to present witnesses on its own behalf. The inmate does not have the right to cross-examine witnesses. The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information. If the Board denies an inmate's request to present a witness, the reason is documented on the disciplinary report.

23. The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence. The Board documents reasons for such exclusion on the disciplinary report.

24. Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.

25. The Hearing Board must find the inmate guilty or not guilty of the charges specified. If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.

4

26.    The Board writes the hearing results on the disciplinary report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review. If the inmate is found not guilty, the hearing board must remove the notification of charges form from the inmate's file.

27.    Interfering with lockdowns or counts is a major offense, and profanity or derogatory remarks or gestures to a staff member is a major offense.

28.    If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status. The customary time limit for disciplinary status for a major offense is up to 10 days.

29.    An inmate on disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.

30.    It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff.

31.    It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment.

32.    It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary.

33.    Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily.

34.    The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas.

35.    Each cleaning consists of the following:  Floors are swept and mopped.  Toilets are scrubbed with toilet cleanser and disinfectant.  Sinks and showers are scrubbed with scouring cleanser and disinfectant.  Tables and benches are washed.  Bunks and sleeping areas are made clean and orderly.  Trash receptacles are emptied and washed daily.

36.    The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

37.    The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.

38.    It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.

39.    The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month.  A licensed pest control service is contracted to provide control for vermin and insects.  Detention Center personnel utilize

this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.

40.    Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the chief deputy.

41.    All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.

42.    It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that sanitation and hygiene may be maintained.    All facility issued clothing and linens are laundered according to established schedules.

43.    Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.

44.    All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.

45.    Any inmates on work release have their clothing laundered daily, if necessary.

46.    The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week.    The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week.    Clothing belonging to trusties is laundered on Wednesdays and Saturdays.

47.    Any contaminated clothing is washed separately from all other laundry.

48.    Inmate linens are collected to be laundered at least once each week.

49.    Blankets are laundered at least once each month.

7

50.    It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.

51.    All members of the Detention Center staff make every effort to facilitate private, uncensored communications between inmates and their attorneys.

52.    Members of the Detention Center staff commit no act(s) which will deny or hinder in any way the right of an inmate to have access to the courts.

53.    Written legal materials from inmates which they intend to be carried by the United States mail will be mailed immediately without being opened or read.

54.    Inmates are given access to the telephones in the dayroom each day from 7:00 a.m. until 9:00 p.m.

55.    Telephone privileges are also extended to persons not incarcerated in the dayroom area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and 9:00 p.m.

56.    Inmates are entitled to privileged visits at any reasonable time as determined by the chief deputy sheriff.

57.    Persons incarcerated in the Lee County Detention Center may have access to the Lee County Detention Center Law Library after submitting a written request to the Chief Deputy Sheriff, Captain, Lieutenant, or shift supervisor.

58.    If possible, the inmate requesting access to the library should make a specific request for materials needed.  If this is possible, a member of the Detention Center staff will obtain copies of those materials and return them to the inmate.  If not, the inmate will be taken to the library at the next available time.

59.    Inmates in segregation who may not visit the library may make requests for specific documents.

60.    It is the policy of the Lee County Sheriff's Office to encourage correspondence between inmates housed in the Lee County Detention Center and those persons in the community who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press.

61.    Inmates may write an unlimited number of letters.    Stamps, writing paper, envelopes, and pencils are available for purchase at the commissary. Indigent inmates are given enough supplies to write and mail up to three letters each week.

62.    It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the sheriff, chief deputy sheriff, or Detention Center personnel.

63.    Inmates housed in the Lee County Detention Center are furnished with inmate request forms for the purpose of stating their requests or grievances in writing. Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate. The officer receiving the request form is to answer the request if possible. If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered. If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed. If the officer to whom the request

9

is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day.

64.     Internal grievance procedures at the Lee County Detention Center are available to all inmates. It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.

65.     All inmates are provided access to a Lee County Detention Center Inmate Handbook. A copy of this handbook is placed in each cellblock for inmates to review whenever they wish. The inmate handbook states that an inmate may report a grievance on an inmate request form. Grievances are first answered by the appropriate staff at the lowest level in the chain of command. The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to the Sheriff, who will make the final decision.

66.     The Plaintiff has never made any request to me regarding the sanitation of his cell.

67.     I witnessed the Plaintiff fake a fall while being escorted down the E-wing hall. Officer Aaron was approximately 6 feet behind the Plaintiff when he fell. The Plaintiff began yelling and screaming as if he were injured. He then got up and continued walking to E-6 without any problems. Officer Aaron did not push or touch the Plaintiff or in any way cause the Plaintiff to fall.

68.     I have complied with all policies and procedures of the Lee County Detention Center. I am not aware of nor have I authorized or allowed any deviation from said policies and procedures.

69.    I swear, to the best of my present knowledge and information that the above

statements are true, that I am competent to make this affidavit and that the above statements were

made by drawing from my personal knowledge of the situation.


_Corey C. Welch_
COREY WELCH

**SWORN TO** and **SUBSCRIBED** before me this _4_ day of December, 2006.


_Adria D. Brisago_
NOTARY PUBLIC            My Commission Expires December 10, 2007
My Commission Expires:_____

11

**Exhibit F**
**Affidavit of Sergeant Tommy Threat**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| SHARODERICK ANTON SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:06-cv-00834-WKW-VPM |
| | ) |
| LEON AARON, et al., | ) |
| | ) |
| Defendants. | ) |

### AFFIDAVIT OF TOMMY THREAT

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF LEE | ) |

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Tommy Threat, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.    My name is Tommy Threat.  I am over the age of nineteen and competent to execute this affidavit.

2.    I am employed by the Lee County Sheriff's Office and assigned to serve at the Lee County Detention Center.  I have achieved the rank of Sergeant.  I have been employed at the Lee County Detention Center for six (6) years.  I am a graduate of the Alabama Jail Management School.

3.    I am familiar with the Plaintiff Sharoderick Anton Smith due to his incarceration in the Lee County Detention Center.

4.    I state affirmatively that I neither acted, nor caused anyone to act, in such a manner as to deprive the Plaintiff of any right to which he was entitled.

5.    Inmate counting procedures are conducted at the change of each shift to ensure the security of the facility.

6.    The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively.

7.    Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility.

8.    All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m.  All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list.  All inmates are aware of these rules by access to the inmate handbook.

9.    It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation.

10.    It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center.

11.    The Lee County Sheriff's Office operates the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control.

12.    When the use of force is necessary, only the minimum amount needed to accomplish the task at hand is used.

13.    Physical force is used only as a last resort.  All reasonable attempts are made to identify and utilize alternative means to deal with the situation.

14.    Physical force or chemical agents may be used in the following incidences:

a. Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person.

b. In defending one's self or others against any physical assault.

c. To prevent the commission of a misdemeanor.

d. To prevent serious damage to property.

e. To enforce Detention Center regulations.

f. To prevent or quell a riot.

15. It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person.

16. It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing in order to avoid violation of the inmate's right to due process and the arbitrary application of discipline.

17. The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee who was not directly involved in the incident being reviewed.

18. The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.

19. The Hearing Board must convene within seven days, excluding weekends and holidays, of the time the inmate was notified of his charges.

20. Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held. The inmate may consent to a hearing within

less than 24 hours, but he must do so in writing.

21.    An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.

22.    Each side has the right to present witnesses on its own behalf. The inmate does not have the right to cross-examine witnesses. The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information. If the Board denies an inmate's request to present a witness, the reason is documented on the Disciplinary Report.

23.    The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence. The Board documents reasons for such exclusion on the Disciplinary Report.

24.    Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.

25.    The Hearing Board must find the inmate guilty or not guilty of the charges specified. If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.

26.    The Board writes the hearing results on the Disciplinary Report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review. If the inmate is found not guilty, the hearing board must remove the notification of charges form from the inmate's file.

27.    Interfering with lockdowns or counts is a major offense, and profanity or derogatory remarks or gestures to a staff member is a major offense.

28.    If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status. The customary time limit for disciplinary status for a major offense is up to 10 days.

29.    An inmate on disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.

30.    It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff.

31.    It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment.

32.    It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary.

33.    Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily.

34.    The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas.

35.     Each cleaning consists of the following: Floors are swept and mopped. Toilets are scrubbed with toilet cleanser and disinfectant. Sinks and showers are scrubbed with scouring cleanser and disinfectant. Tables and benches are washed. Bunks and sleeping areas are made clean and orderly. Trash receptacles are emptied and washed daily.

36.     The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

37.     The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.

38.     It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.

39.     The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month. A licensed pest control service is contracted to provide control for vermin and insects. Detention Center personnel utilize this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.

40.     Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the Chief Deputy.

41.     All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.

42.     It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that

sanitation and hygiene may be maintained.  All facility issued clothing and linens are laundered according to established schedules.

43.    Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.

44.    All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.

45.    Any inmates on work release have their clothing laundered daily, if necessary.

46.    The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week.  The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week.  Clothing belonging to trusties is laundered on Wednesdays and Saturdays.

47.    Any contaminated clothing is washed separately from all other laundry.

48.    Inmate linens are collected to be laundered at least once each week.

49.    Blankets are laundered at least once each month.

50.    It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.

51.    All members of the Detention Center staff make every effort to facilitate private, uncensored communications between inmates and their attorneys.

52.    Members of the Detention Center staff commit no act(s) which will deny or hinder in any way the right of an inmate to have access to the courts.

53.    Written legal materials from inmates which they intend to be carried by the United States mail will be mailed immediately without being opened or read.

54.    Inmates are given access to the telephones in the dayroom each day from 7:00 a.m. until 9:00 p.m.

55.    Telephone privileges are also extended to persons not incarcerated in the dayroom area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and 9:00 p.m.

56.    Inmates are entitled to privileged visits at any reasonable time as determined by the chief deputy sheriff.

57.    Persons incarcerated in the Lee County Detention Center may have access to the Lee County Detention Center Law Library after submitting a written request to the chief deputy sheriff, captain, lieutenant, or shift supervisor.

58.    If possible, the inmate requesting access to the library should make a specific request for materials needed.  If this is possible, a member of the Detention Center staff will obtain copies of those materials and return them to the inmate.  If not, the inmate will be taken to the library at the next available time.

59.    Inmates in segregation who may not visit the library may make requests for specific documents.

60.    It is the policy of the Lee County Sheriff's Office to encourage correspondence between inmates housed in the Lee County Detention Center and those persons in the community who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press.

61.    Inmates may write an unlimited number of letters.    Stamps, writing paper,

envelopes, and pencils are available for purchase at the commissary. Indigent inmates are given enough supplies to write and mail up to three letters each week.

62. It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the Sheriff, chief deputy sheriff, or Detention Center personnel.

63. Inmates housed in the Lee County Detention Center are furnished with Inmate Request Forms for the purpose of stating their requests or grievances in writing. Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate. The officer receiving the request form is to answer the request if possible. If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered. If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed. If the officer to whom the request is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day.

64. I have never received any request form from the Plaintiff concerning any of the allegations made the basis of his Complaint.

65. Internal grievance procedures at the Lee County Detention Center are available to all inmates. It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.

66. All inmates are provided access to a Lee County Detention Center Inmate Handbook. A copy of this handbook is placed in each cellblock for inmates to review whenever they wish. The inmate handbook states that an inmate may report a grievance on an

inmate request form. Grievances are first answered by the appropriate staff at the lowest level in the chain of command. The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to the Sheriff, who will make the final decision.

67.    I have never received a grievance from the Plaintiff concerning any of the allegations made the basis of his Complaint. ·

68.    I witnessed the Plaintiff fake a fall while being escorted down the E-wing hall. Officer Aaron was approximately 6 feet behind the Plaintiff when he fell. The Plaintiff began yelling and screaming as if he were injured. He then got up and continued walking to E-6 without any problems. Officer Aaron did not push or touch the Plaintiff or in any way cause the Plaintiff to fall.

69.    After a disciplinary hearing, based on the testimony presented, the Plaintiff was found guilty of interfering with lockdown and served ten days in lockdown. The Plaintiff was given notice of the hearing and an opportunity to be heard at the hearing. He was also allowed to call witnesses at the hearing to testify in his defense. The Plaintiff was not permitted to be present during their testimony because we were concerned that the witnesses would be intimidated by his presence which may have an effect on their testimony.

70.    I have complied with all policies and procedures of the Lee County Detention Center. I am not aware of nor have I authorized or allowed any deviation from said policies and procedures.

71.    I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit and that the above statements were made by drawing from my personal knowledge of the situation.


TOMMY THREAT

SWORN TO and SUBSCRIBED before me this 4th day of December, 2006.


NOTARY PUBLIC
My Commission Expires: 03-09-2008

11

# Exhibit G
# Affidavit of Corrections Officer Leon Aaron

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

SHARODERICK ANTON SMITH,           )
                                   )
            Plaintiff,             )
                                   )
v.                                 )  Civil Action No.  3:06-cv-00834-WKW-VPM
                                   )
LEON AARON, et al.,                )
                                   )
            Defendants.            )

## AFFIDAVIT OF LEON AARON

STATE OF ALABAMA         )
                         )
COUNTY OF LEE            )

**BEFORE ME**, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Leon Aaron, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.      My name is Leon Aaron.  I am over the age of nineteen and competent to execute this affidavit.

2.      I am employed by the Lee County Sheriff's Office and assigned to serve as a Corrections Officer at the Lee County Detention Center.  I have worked as a correctional officer for three and one-half (3 1/2) years.  I am a graduate of the Alabama Jail Management School.

3.      I am familiar with the Plaintiff Sharoderick Anton Smith due to his incarceration in the Lee County Detention Center.

4.      I state affirmatively that I neither acted, nor caused anyone to act, in such a manner as to deprive the Plaintiff of any right to which he was entitled.

5.      Inmate counting procedures are conducted at the change of each shift to ensure the

security of the facility.

6.    The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively.

7.    Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility.

8.    All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m. All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list. All inmates are aware of these rules by access to the inmate handbook.

9.    It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation.

10.    It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center.

11.    The Lee County Sheriff's Office operates the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control.

12.    When the use of force is necessary, only the minimum amount needed to accomplish

the task at hand is used.

13.    Physical force is used only as a last resort.  All reasonable attempts are made to identify and utilize alternative means to deal with the situation.

14.    Physical force or chemical agents may be used in the following incidences:

    a.    Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person.

    b.    In defending one's self or others against any physical assault.

    c.    To prevent the commission of a misdemeanor.

    d.    To prevent serious damage to property.

    e.    To enforce Detention Center regulations.

    f.    To prevent or quell a riot.

15.    It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person.

16.    It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing in order to avoid violation of the inmate's right to due process and the arbitrary application of discipline.

17.    The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee who was not directly involved in the incident being reviewed.

18.    The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.

3

19.    The Hearing Board must convene within seven days, excluding weekends and holidays, of the time the inmate was notified of his charges.

20.    Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held. The inmate may consent to a hearing within less than 24 hours, but he must do so in writing.

21.    An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.

22.    Each side has the right to present witnesses on its own behalf. The inmate does not have the right to cross-examine witnesses. The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information. If the Board denies an inmate's request to present a witness, the reason is documented on the Disciplinary Report.

23.    The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence. The Board documents reasons for such exclusion on the Disciplinary Report.

24.    Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.

25.    The Hearing Board must find the inmate guilty or not guilty of the charges specified. If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.

26.    The Board writes the hearing results on the Disciplinary Report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review. If the

inmate is found not guilty, the hearing board must remove the Notification of Charges form from the inmate's file.

27.     Interfering with lockdowns or counts is a major offense, and Profanity or derogatory remarks or gestures to a staff member is a major offense.

28.     If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status.  The customary time limit for disciplinary status for a major offense is up to 10 days.

29.     An inmate on Disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.

30.     It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff.

31.     It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment.

32.     It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary.

33.    Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily.

34.    The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas.

35.    Each cleaning consists of the following: Floors are swept and mopped. Toilets are scrubbed with toilet cleanser and disinfectant. Sinks and showers are scrubbed with scouring cleanser and disinfectant. Tables and benches are washed. Bunks and sleeping areas are made clean and orderly. Trash receptacles are emptied and washed daily.

36.    The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

37.    The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.

38.    It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.

39.    The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month. A licensed pest control service is contracted to provide control for vermin and insects. Detention Center personnel utilize this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.

40.    Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the Chief Deputy.

41.    All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.

42.    It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that sanitation and hygiene may be maintained.   All facility issued clothing and linens are laundered according to established schedules.

43.    Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.

44.    All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.

45.    Any inmates on work release have their clothing laundered daily, if necessary.

46.    The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week.  The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week.  Clothing belonging to trusties is laundered on Wednesdays and Saturdays.

47.    Any contaminated clothing is washed separately from all other laundry.

48.    Inmate linens are collected to be laundered at least once each week.

49.    Blankets are laundered at least once each month.

50.    It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.

51.    All members of the Detention Center staff make every effort to facilitate private,

uncensored communications between inmates and their attorneys.

52.    Members of the Detention Center staff commit no act(s) which will deny or hinder in any way the right of an inmate to have access to the courts.

53.    Written legal materials from inmates which they intend to be carried by the United States mail will be mailed immediately without being opened or read.

54.    Inmates are given access to the telephones in the dayroom each day from 7:00 a.m. until 9:00 p.m.

55.    Telephone privileges are also extended to persons not incarcerated in the dayroom area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and 9:00 p.m.

56.    Inmates are entitled to privileged visits at any reasonable time as determined by the chief deputy sheriff.

57.    Persons incarcerated in the Lee County Detention Center may have access to the Lee County Detention Center Law Library after submitting a written request to the chief deputy sheriff, captain, lieutenant, or shift supervisor.

58.    If possible, the inmate requesting access to the library should make a specific request for materials needed.  If this is possible, a member of the Detention Center staff will obtain copies of those materials and return them to the inmate.  If not, the inmate will be taken to the library at the next available time.

59.    Inmates in segregation who may not visit the library may make requests for specific documents.

60.    It is the policy of the Lee County Sheriff's Office to encourage correspondence between inmates housed in the Lee County Detention Center and those persons in the community

who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press.

61.     Inmates may write an unlimited number of letters.    Stamps, writing paper, envelopes, and pencils are available for purchase at the commissary.   Indigent inmates are given enough supplies to write and mail up to three letters each week.

62.     It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the Sheriff, chief deputy sheriff, or Detention Center personnel.

63.     Inmates housed in the Lee County Detention Center are furnished with Inmate Request Forms for the purpose of stating their requests or grievances in writing. Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate. The officer receiving the request form is to answer the request if possible. If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered. If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed. If the officer to whom the request is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day.

64.     I have never received any request form from the Plaintiff concerning any of the allegations made the basis of his Complaint.

65.     Internal grievance procedures at the Lee County Detention Center are available to all inmates. It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.

66.     All inmates are provided access to a Lee County Detention Center Inmate Handbook. A copy of this handbook is placed in each cellblock for inmates to review whenever they wish. The inmate handbook states that an inmate may report a grievance on an inmate request form. Grievances are first answered by the appropriate staff at the lowest level in the chain of command. The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to the Sheriff, who will make the final decision.

67.     I have never received a grievance from the Plaintiff concerning any of the allegations made the basis of his Complaint.

68.     On August 10, 2006, at approximately 7:45 a.m., I was conducting headcount in cell D-3. As I was calling names for headcount, the Plaintiff stated: could you keep the noise down. The Plaintiff's head was covered with his blanket and so I approached the bunk, tapped him to get his attention, and then pulled the blanket back to verify who the inmate was.

69.     The Plaintiff then sat up at started speaking loudly and belligerently to me saying: why are you putting your hands on me.

70.     I told the Plaintiff to get his property together to be moved to D-4 because he was disturbing jail operations.

71.     The Plaintiff then replied: "Fuck it." Just put me in E-6.

72.     I exited the cell at that time to complete the headcount. Then I returned to cell D-3 to move the Plaintiff to cell E-6.

73. I and another officer escorted the Plaintiff to the property room to go through his property before being escorted to E-6.

74. The Plaintiff continued to make derogatory remarks toward me and the other officer. He stated that he wanted us to put our hands on him so he could sue us.

75. As we were passing cells E3 and E4 in the hall of E-Wing, I was approximately 6 feet behind the Plaintiff, and the other officer was eight feet behind the Plaintiff. At that time, the Plaintiff fell forward as if he were pushed. The Plaintiff began yelling and screaming as if he was injured. We advised him to get up which he did. He then continued walking to E-6 without any problems.

76. I did not use any force on the Plaintiff at the time he fell.

77. I have complied with all policies and procedures of the Lee County Detention Center. I am not aware of nor have I authorized or allowed any deviation from said policies and procedures.

78. I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit and that the above statements were made by drawing from my personal knowledge of the situation.


_____
LEON AARON

SWORN TO and SUBSCRIBED before me this 4<sup>th</sup> day of December, 2006.


_____
NOTARY PUBLIC
My Commission Expires: 03-09-2008

11

# Exhibit H
# Special Report by Officer Aaron

## LEE COUNTY SHERIFF'S DEPARTMENT
### SPECIAL REPORT

OCA# 16866

Subject SMITH, SHARODERICK    Opelika, AL    8/10/2006

To the Sheriff of Lee County:

I report the following J-3 SMITH MOVED FROM CELLBLOCK D-3 TO CELLBLOCK E-6 which occurred at 0745 o'clock

this A M. at LEE COUNTY DETENTION CENTER

Below give full-particulars, together with name of principals and witness and their address

AT OR AROUND THE ABOVE DATE AND TIME OFC LEON AARON 43D31 WAS CONDUCTING HEADCOUNT ALONG WITH OFFICER JAMES SCROGGINS 43D20 AND CPL ANGELO COBB      IN CELL D-3, AT THIS TIME OFC AARON WAS CALLING NAMES FOR HEADCOUNT WHEN J-3 SMITH STATED COULD YOU KEEP THE NOISE DOWN. J-3 SMITH'S HEAD WAS COVERED WITH HIS BLANKET. OFC AARON APPROACHED THE BUNK AND PULLED HIS BLANKET BACK TO VERIFY WHO THE INMATE WAS. J-3 SMITH THEN SAT UP AND STARTED BEING VERY DISRESPECTFUL STATING, WHY ARE YOU PUTTING YOUR HANDS ON ME AND GETTING VERY LOUD. OFC AARON ADVISED J-3 SMITH TO PACK HIS PROPERTY THAT HE WAS BEING MOVED TO D-4 FOR HIS ACTIONS. J-3 SMITH THEN STATED "FUCK IT" JUST PUT ME IN E-6. OFC AARON EXITED THE CELL AND CONTINUED WITH THE HEADCOUNT. OFC AARON AND OFC MATTHEW PHILLIPS 43D48 THEN RETURNED TO CELL D-3 TO MOVE J-3 SMITH TO CELL E-6. OFC AARON AND OFC PHILLIPS ESCORTED J-3 SMITH TO THE 39 ROOM TO GO THROUGH HIS PROPERTY BEFORE BEING ESCORTED TO E-6. J-3 SMITH CONTINUED TO MAKE DEROGATORY REMARKS AND STATEMENTS TOWARDS OFC AARON AND OFC PHILLIPS. J-3

Reported by _____

Address _____ Phone _____

Complaint received by _____ How _____

Assigned to _____

# LEE COUNTY SHERIFF'S DEPARTMENT
## SPECIAL REPORT

OCA# 1LOBLOLO

Subject SMITH, SHARODERICK    Opelika, AL    8/10/2006

To the Sheriff of Lee County:

I report the following " CONTINUED "

_____ which occurred at 0745 o'clock

this ___A___ M. at LEE COUNTY DETENTION CENTER

Below give full-particulars, together with name of principals and witness and their address

SMITH ALSO KEPT STATING THAT HE WAS GONNA SUE AND THE HE WANTED US TO PUT OUR HANDS ON HIM. J-3 SMITH WAS BEING ESCORTED DOWN E-WING HALL BY OFC'S AARON AND PHILLIPS. J-3 SMITH WAS APPROXIMATELY 6 FEET IN FRONT OF OFC. AARON IN THE MIDDLE OF THE HALL. J-3 SMITH WAS APPROXIMATELY 8 FEET IN FRONT OF OFC. PHILLIPS. OFC. AARON + OFC. PHILLIPS WERE BOTH WALKING ON OPPOSITE SIDES OF THE HALLWAY WITH J-3 SMITH IN THE MIDDLE. J-3 SMITHS WAS PASSING CELLS E3 + E4 WHEN J-3 SMITH FELL FOWARD AS IF HE WAS PUSHED. J-3 SMITH BEGAN YELLING AND SCREAMING AS IF HE WAS INJURED. J-3 SMITH WAS ADVISED TO GET UP AND CONTINUE ON TO E-6. J-3 SMITH GOT UP WITH NO PROBLEM AND WALKED TO E-6. SGT. TOMMY THREAT 43DM ALONG WITH OFC'S SCROGGINS + OFC GRIGGS WITNESSED J-3 SMITH FAKE A FALL. J-3 SMITH' WAS PLACED IN E-6 WITHOUT FURTHER INCIDENT. J-3 ADVISED HE WAS GOING TO SUE AND WRITE ALL THE OFC'S UP.

RESPECTIVELY SUBMITTED
LEON C. AARON
OFFICER    43D31
CORRECTIONS DIVISION

Reported by_____

Address_____    Phone_____

Complaint received by_____    How_____

Assigned to _____

**Exhibit I**
**Special Report by Matthew Phillips**

## LEE COUNTY SHERIFF'S DEPARTMENT
## SPECIAL REPORT

Subject: _Movement of I/m Sharodrick Smith_ To E6    Opelika, AL. 8/10/2006

To the Sheriff of Lee County:

I report the following    OCA# 16866    _I/m Sharodrick Anton Smith Acting_

_Like He was Pushed To The Floor_ By Officers. which occurred at _0745_ o'clock

this ____ _A._ M. at _Lee County Detention Center_

Below give full-particulars, together with name of principals and witness and their address

_On or Around The Above Date And Time Ofc. Matthew Phillips_
_43D48 and Ofc. Leon Aaron 43D31 were Transporting I/m_
_Sharodrick Anton Smith From Cell Block D3 To E6 For A_
_Verbal Altercation That Happened During HeadCount. At_
_07:30 a.m. Ofc. Aaron and Ofc. Phillips escorted I/m Smith_
_From Cell D3 To The 39 Room To Go Through His Property._
_While Ofc. Phillips was Going Through His Property, I/m Smith_
_was Being Very Vocal Towards Ofc. Phillips and Ofc. Aaron. At_
_0743 a.m. Ofc. Phillips and Ofc. Aaron were Walking Down E-Wing_
_With I/m Smith, After Passing Cell E3 And E4's Door I/m Smith_
_Fell Forward As If He was Pushed. Ofc. Aaron was Approximetly_
_6 Feet Behind and To His LeftAnd Ofc. Phillips was Approximetly_
_8 Feet Behind And To His Right. I/m Smith was Yelling Like He was_
_Hurt But Got Up Under His Own Power and Walked To E6 Saying_
_He was Going To Sue Everybody And Write All The Officers Up._
_Sgt. Threat was Notified At Which He Observed The Incident_
_From Central Control Ofc. Phillips Submitted A Special Report._
_No Further Action was Taken._

_Respectfully Submitted By_
_Matthew D Phillips_
_Officer    43D48_
_Corrections Division_

Reported by: _____

Address: _____    Phone: _____

Complaint received by: _____

Assigned to: _____

**Exhibit J**
**Disciplinary Report**

**Copy**

## LEE COUNTY DETENTION CENTER
### DISCIPLINARY REPORT
(Form #28)

Inmate SMITH, SHARODERICK ANTON    Custody MAXIMUM    Number 160860
                    List    First    Middle

Assignment E-WING CELL BLOCK E-6 is being charged by OFC. AARON 43D31

With rule violation 14.2 B-14 " INTERFERING WITH LOCKDOWNS OR COUNTS

on or about 8/10    1992 2006 Time 0745 (a.m)/p.m. Location LCDC

Circumstances are as follows: I.3 SMITH BECAME VERBALLY LOUD
WITH OFC AARON WHILE OFC AARON WAS TRYING TO
CONDUCT HEADCOUNT

MAJOR      X
MINOR      ___
SERIOUS    ___                                OFC 43D31

Notifying Officer: Cpl A. Cell 43D31    Signature of Arresting Officer
                                         Time & Date notified: 8/10/06 1730hrs
Inmate's Signature X Sharoderick Smith    Witnesses desired: NO ___ (YES), (List) Rowell,
Tyrone; Thomas, Henry; Williams, Britt; Avery, Eddie

Circumstances Investigated By: _____

Hearing date _____    Time _____    Plea ( ) Guilty (X) Not Guilty

If guilty, inmate must affix signature _____

_____

Committee Findings & Reasons: "Guilty" Due to officer statement
and Inmate own statement. Also inmate witness
Support officer accusations.

_____

Committee Recomendations: 10 days lockdown 10 days loss of all
privileages not to include clorgy media or attorney

_____

Witnesses: _____    43D07
                                   Signature of Chairman

                                   Signature, Member

                                   Signature, Member

Copy delivered to inmate: Date _____    Time _____    Inmate's Signature _____
Action - Date _____                      Appeal - Date (attach copy) _____
Approved _____                           Approved _____
Disapproved _____                        Denied 9-21-06 _____
Other (Specify) _____                    Other (Specify) _____

# Exhibit K
## Inmate Medical File
# Notes by Nurse Linda Stewart dated August 12, 2006

NOTES

NAME _Smith, Sharoderick_ SS# ▓▓▓▓▓▓▓

DOB: ▓▓▓▓▓     AGE: _35_     SEX: _m_     RACE: _B_

DRUG ALLERGIES: _Ø_     TETNUS: _____

NATURE OF PROBLEM OR REQUEST: _C/o acute back_
_pain from Allegedly pushed by_
_an officer_

I CONSENT TO BE TREATED BY HEALTH STAFF FOR THE CONDITION DESCRIBED.

_____
SIGNATURE

## HEALTH CARE DOCUMENTATION

SUBJECTIVE:

OBJECTIVE: BP _____ P _____ R _____ T _____ O2 _98_ _8_

ASSESSMENT: _I/m Brought To Clinic By Officer_
_rown I/m c/o that an officer push him_
_was in hell See that Officer; report,_
_I/m c/o unable To Bend To touch toes_
_they well getting up & down out of chair_
_ee 5 any difficulty_

PLAN: _This has been reported To Lt's_
_& call m.d) for c/o back pain To_
_notring b/d x 3 days._

EFER TO: _____ (PA/PHYSICIAN) _____ MENTAL HEALTH _____ DENTAL _____

GNATURE _Stewart_ TITLE _LPN_ DATE _/ / _ TIME _16 02_

**Exhibit L**
**Inmate Medical File**
**Notes by John McFarland, MD dated August 15, 2006**

# NOTES

NAME _Smith, Sharoderick_ SS# ▓▓▓▓▓

DOB: ▓▓▓▓ AGE: 25 SEX: M RACE: B

DRUG ALLERGIES: Ø TETNUS: _____

NATURE OF PROBLEM OR REQUEST: _back pain_

I CONSENT TO BE TREATED BY HEALTH STAFF FOR THE CONDITION DESCRIBED.

_____
SIGNATURE

## HEALTH CARE DOCUMENTATION

160#
6'1"

SUBJECTIVE:

OBJECTIVE: BP _____ P _____ R _____ T _____ O2 _____

ASSESSMENT:

08/15/06    **Lee County Detention Center**    **Sharoderick Smith**    **#416115356**
This 25 YOBM has had some low back pain for the past five days. He says he was pushed from the back as he was carrying his roll. He fell forward over his bedroll. He says he hurts in his back.
**Physical Exam:** He shows me his right knee where he says he landed. There is no sign of any injury. He walks with a normal comfortable gait. He seems to be more comfortable for the examination with the examination. He can barely flex, extend, or rotate his back. He is stiff and tight in his entire low back. There is no midline tenderness. There is no point tenderness. Straight leg raise is negative. There is no right effusion or other sign of trauma.
**Impression:** Lumbar strain and spasm.

**Plan:** Naprosyn 500 mg b.i.d. #14 and Flexeril 10 mg b.i.d. #10. Recheck as needed. He also wants his urine rechecked because he said he had some blood in it.

PLAN:

rc√ urine.    Nrg/ Ny    8/17/06
Naprosyn 500 Bid #14
Flexeril 10 Bid #10

REFER TO: _____ PA/PHYSICIAN ____ MENTAL HEALTH ____ DENTAL ____

SIGNATURE _____ TITLE _MD_ DATE _8/15/06_ TIME _0937_

JOHN H MCFARLAND MD
AM8104894
AL11404

**Exhibit M**
**Inmate Medical File**
**Inmate Request Slip dated August 9, 2006**

## Lee County Detention Center
## INMATE REQUEST SLIP

LOCATION
E-2

Name Shamdrick Smith

Date

☐ Telephone Call      ☐ Doctor      ☐ Dentist
☐ Special Visit        ☐ Personal Problem    ☐ Time Sheet
☑ Other

Briefly Outline Your Request, Give To Jailer

Need something for a headache

Do Not Write Below This Line - For Reply Only

7/28/06  to the gym

headache

All Request Will Be Routed Through The Sergeant Over The Jail, Then Forwarded To
Those The Request is Directed.

Approved _____   Denied _____   Collect Call _____

☐ Lieutenant      ☐ Chief Deputy    ☐ Sheriff

Date _____   Time Received _____

CORRECTION OFFICER _____

FORM: LCS-038  (6/99)

---

## Lee County Detention Center
## INMATE REQUEST SLIP

LOCATION
E-6

Name Shamdrick Anton Smith  Date  Aug 9 2006

AIS 199538

☐ Telephone Call      ☑ Doctor      ☐ Dentist
☐ Special Visit        ☐ Personal Problem    ☐ Other
☐ Time Sheet

Briefly Outline Your Request, Give To Jailer

My back is hurting and
I need to see a doctor ASAP

Do Not Write Below This Line - For Reply Only

8/13/06  You will see
a Dr. you is weis
a Dr.

All Request Will Be Routed Through The Sergeant Over The Jail, Then Forwarded To
Those The Request is Directed.

Approved _____   Denied _____   Collect Call _____

☐ Lieutenant      ☐ Chief Deputy    ☐ Sheriff

Date _____   Time Received _____

CORRECTION OFFICER _____

FORM: LCS-038  (6/99)

# Exhibit N
# Affidavit of Jay Jones

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| SHARODERICK ANTON SMITH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:06-cv-00834-WKW-VPM |
| | ) |
| LEON AARON, et al., | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF JAY JONES

| | |
|---|---|
| STATE OF ALABAMA | ) |
| | ) |
| COUNTY OF LEE | ) |

BEFORE ME, the undersigned authority and Notary Public in and for said County and State at large, personally appeared Jay Jones, who being known to me and being by me first duly sworn on oath deposes and says as follows:

1.     My name is Jay Jones.  I am over the age of nineteen and competent to execute this affidavit.

2.     I am the duly elected Sheriff of Lee County, Alabama, and have served in such capacity since 1999.

3.     I am familiar with the Plaintiff Sharoderick Anton Smith due to his incarceration in the Lee County Detention Center.  I have no personal knowledge of any of the specific allegations that form the basis of Plaintiff's Complaint.

4.    As Sheriff of Lee County, I am responsible for promulgating the policies governing the Lee County Detention Center.

5.    Inmate counting procedures are conducted at the change of each shift to ensure the security of the facility.

6.    The shift supervisor leaving duty and the shift supervisor coming on duty, or a person designated by them, conducts an inmate count at the close and beginning of their shifts, respectively.

7.    Once all inmates in the facility have been accounted for, the officers conducting the count return to the booking area to identify the location of any inmates who may be on trusty status and outside the Detention Center, inmates who may be receiving medical treatment outside the Detention Center, or those inmates who may be in court or elsewhere outside the Detention Center facility.

8.    All inmates are to have their beds made and be ready for morning inspection by 7:00 a.m. All beds must remain made until 8:00 p.m. unless an inmate is on the medical bed list. All inmates are aware of these rules by access to the inmate handbook.

9.    It is the policy of the Lee County Sheriff's Office that Detention Center staff use only the minimum physical force necessary to control combative or uncooperative inmates. Physical abuse is not used to punish an inmate for a rule violation.

10.    It is the policy of the Lee County Sheriff's Office that force and restraints are used in the Lee County Detention Center only when it is necessary to do so in order to maintain appropriate control and management and provide for secure and orderly running of the Detention Center.

11.    The Lee County Sheriff's Office operates the Lee County Detention Center under the belief that control and management of inmates incarcerated there should be by sound scientific methods, stressing moral values and organized persuasion rather than depending upon physical force for effective management and control.

2

12.     When the use of force is necessary, only the minimum amount needed to accomplish the task at hand is used.

13.     Physical force is used only as a last resort.  All reasonable attempts are made to identify and utilize alternative means to deal with the situation.

14.     Physical force or chemical agents may be used in the following incidences:

    a.     Prior to the use of deadly force to prevent the commission of a felony, including escape or to prevent an act which could result in death or serious bodily harm to one's self or another person.

    b.     In defending one's self or others against any physical assault.

    c.     To prevent the commission of a misdemeanor.

    d.     To prevent serious damage to property.

    e.     To enforce Detention Center regulations.

    f.     To prevent or quell a riot.

15.     It is the policy of the Lee County Sheriff's Office to establish rules and regulations governing the behavior of persons incarcerated in the Lee County Detention Center and to subject such persons to discipline for violation of those rules only in a matter which provides due process for the accused person.

16.     It is the policy of the Lee County Sheriff's Office that inmates charged with violations of major or serious rules are given the opportunity to participate in a disciplinary hearing in order to avoid violation of the inmate's right to due process and the arbitrary application of discipline.

17.     The Disciplinary Hearing Board is made up of the chief deputy sheriff or his designee who was not directly involved in the incident being reviewed.

18.     The Hearing Board notifies the inmate, in writing, of the charges against him within 24 hours after the investigation of the rule violation was completed.

3

19.    The Hearing Board must convene within seven days, excluding weekends and holidays, of the time the inmate was notified of his charges.

20.    Once a hearing is scheduled, the Board notifies the inmate, in writing, of the hearing date and time at least 24 hours before it is to be held.  The inmate may consent to a hearing within less than 24 hours, but he must do so in writing.

21.    An inmate may also, by written waiver, refuse to have the hearing and not contest the charges or possible sanction.

22.    Each side has the right to present witnesses on its own behalf.  The inmate does not have the right to cross-examine witnesses.  The Hearing Board may limit the number of witnesses if the security is threatened or to ensure relevancy and prevent unduly cumulative information.  If the Board denies an inmate's request to present a witness, the reason is documented on the Disciplinary Report.

23.    The inmate may be excluded during the testimony of any witnesses whose testimony must be given in confidence.  The Board documents reasons for such exclusion on the Disciplinary Report.

24.    Each side has the right to make a statement (oral or written) to present any documents, and to review documents introduced as evidence, unless the security, order, or safety of persons is jeopardized.

25.    The Hearing Board must find the inmate guilty or not guilty of the charges specified. If the inmate is found guilty, the Hearing Board must decide any sanctions to be imposed and the specific length of time the inmate is to be on disciplinary status.

26.    The Board writes the hearing results on the Disciplinary Report form, gives one copy to the inmate, and forwards a copy to the chief deputy sheriff or his designee for review.  If the

4

inmate is found not guilty, the hearing board must remove the Notification of Charges form from the inmate's file.

27.    Interfering with lockdowns or counts is a major offense, and Profanity or derogatory remarks or gestures to a staff member is a major offense.

28.    If the Disciplinary Hearing Board finds an inmate guilty of a rule violation, he is placed on disciplinary status. The customary time limit for disciplinary status for a major offense is up to 10 days.

29.    An inmate on Disciplinary status is still given the following, unless the inmate abuses them, or security is threatened: one hour per 24 hours out of the cell for shower and exercise; telephone calls to or from attorneys and clergymen; access to mail; adequate food, light, ventilation, temperature, sanitation, and medical care; and proper clothing, bed, bedding, and use of toilets, sinks, and showers.

30.    It is the policy of the Lee County Sheriff to maintain a healthy environment within the Lee County Detention Center for the benefit of both inmates and the Detention Center staff.

31.    It is the policy of the Lee County Sheriff that the staff of the Lee County Detention Center maintain strict sanitation practices which will provide persons incarcerated in the Detention Center and members of the Detention Center staff with a healthy and sanitary living and working environment.

32.    It is the policy of the Lee County Sheriff's Office to maintain a housekeeping plan at the Lee County Detention Center in order that all areas of the Detention Center are kept clean and sanitary.

33.     Inmate housing areas are cleaned by the inmates assigned to that cell at least two times daily.

34.     The first and second shift supervisors ensure that appropriate cleaning supplies and equipment are issued to inmates and ensure that inmates are properly instructed to clean their cells and common areas.

35.     Each cleaning consists of the following: Floors are swept and mopped. Toilets are scrubbed with toilet cleanser and disinfectant. Sinks and showers are scrubbed with scouring cleanser and disinfectant. Tables and benches are washed. Bunks and sleeping areas are made clean and orderly. Trash receptacles are emptied and washed daily.

36.     The shift supervisor on duty will require inmates to re-clean any areas which are not cleaned correctly the first time.

37.     The Lee County Detention Center staff also uses a steam sanitizer on a regular basis to clean the shower areas of the Facility.

38.     It is the policy of the Lee County Sheriff's Office to maintain a high level of pest and vermin control within the Lee County Detention Center in order to ensure a minimum level of pest infestation.

39.     The chief deputy sheriff ensures that all areas of the Lee County Detention Center are sprayed with insecticide at least once each month. A licensed pest control service is contracted to provide control for vermin and insects. Detention Center personnel utilize this service to the maximum extent allowed in order to prevent and control the infestation of pests and vermin.

40.     Shift supervisors ensure that all appropriate areas of the Detention Center are treated with any additional insecticides or powders necessary as directed by the Chief Deputy.

6

41.    All shift supervisors, when conducting daily housekeeping inspections, look for possible or potential pest problems.

42.    It is the policy of the Lee County Sheriff's Office to provide each person incarcerated in the Lee County Detention Center with a clean set of facility issued clothing, linens, bedding, and a towel upon admission to the Lee County Detention Center in order that sanitation and hygiene may be maintained.   All facility issued clothing and linens are laundered according to established schedules.

43.    Laundry service is provided by the Lee County Sheriff's Office at no expense to inmates.

44.    All trusties have their clothing laundered on a daily basis due to the possibility that they may come in contact with food.

45.    Any inmates on work release have their clothing laundered daily, if necessary.

46.    The E and F wings of the Detention Center change out clothing for laundry on Monday and Thursday of each week.  The remaining areas of the Detention Center change out clothing for laundry on Tuesday and Friday of each week.  Clothing belonging to trusties is laundered on Wednesdays and Saturdays.

47.    Any contaminated clothing is washed separately from all other laundry.

48.    Inmate linens are collected to be laundered at least once each week.

49.    Blankets are laundered at least once each month.

50.    It is the policy of the Lee County Sheriff's Office that persons incarcerated in the Lee County Detention Center have access to the courts, attorneys, and their authorized representatives.

51.    All members of the Detention Center staff make every effort to facilitate private,

7

uncensored communications between inmates and their attorneys.

52.    Members of the Detention Center staff commit no act(s) which will deny or

hinder in any way the right of an inmate to have access to the courts.

53.    Written legal materials from inmates which they intend to be carried by the

United States mail will be mailed immediately without being opened or read.

54.    Inmates are given access to the telephones in the dayroom each day from 7:00

a.m. until 9:00 p.m.

55.    Telephone privileges are also extended to persons not incarcerated in the dayroom

area of the Detention Center on a regular basis, at least four hours per day between 7:00 a.m. and

9:00 p.m.

56.    Inmates are entitled to privileged visits at any reasonable time as determined by

the chief deputy sheriff.

57.    Persons incarcerated in the Lee County Detention Center may have access to the

Lee County Detention Center Law Library after submitting a written request to the chief deputy

sheriff, captain, lieutenant, or shift supervisor.

58.    If possible, the inmate requesting access to the library should make a specific

request for materials needed.  If this is possible, a member of the Detention Center staff will

obtain copies of those materials and return them to the inmate.  If not, the inmate will be taken to

the library at the next available time.

59.    Inmates in segregation who may not visit the library may make requests for

specific documents.

60.    It is the policy of the Lee County Sheriff's Office to encourage correspondence

between inmates housed in the Lee County Detention Center and those persons in the community

who may be of service to them in solving the problems they encounter as a result of their incarceration. The Sheriff's Office staff recognizes that it is important for inmates to maintain ties with family and friends and to exercise their right to free access to courts, government, and the press.

61.    Inmates may write an unlimited number of letters. Stamps, writing paper, envelopes, and pencils are available for purchase at the commissary. Indigent inmates are given enough supplies to write and mail up to three letters each week.

62.    It is the policy of the Lee County Sheriff's Office that members of the Detention Center staff receive and answer any written grievances or requests made by inmates to the Sheriff, chief deputy sheriff, or Detention Center personnel.

63.    Inmates housed in the Lee County Detention Center are furnished with Inmate Request Forms for the purpose of stating their requests or grievances in writing. Detention Center personnel are charged with the responsibility of receiving and forwarding these forms to the proper authority at any time they are offered a completed form by an inmate. The officer receiving the request form is to answer the request if possible. If that officer is unable to answer the request, he is to forward it to the appropriate individual and/or up the chain of command until the request is answered. If the request form is directed to a particular officer, the officer receiving the request will forward the request to the officer to whom the request is directed. If the officer to whom the request is directed is not on duty that day, the request will be addressed on that officer's next scheduled working day.

64.    I have never received any request form from the Plaintiff concerning any of the allegations made the basis of his Complaint.

9

65.     Internal grievance procedures at the Lee County Detention Center are available to all inmates.  It is the policy of the Lee County Sheriff's Office that inmates are permitted to submit grievances and that each grievance will be acted upon.

66.     All inmates are provided access to a Lee County Detention Center Inmate Handbook.  A copy of this handbook is placed in each cellblock for inmates to review whenever they wish.  The inmate handbook states that an inmate may report a grievance on an inmate request form.  Grievances are first answered by the appropriate staff at the lowest level in the chain of command.  The inmate handbook also states that if the inmate is not satisfied with the first answer to his grievance, the inmate may appeal all the way up the chain of command, up to me, and I will make the final decision.

67.     I have never received a grievance from the Plaintiff concerning any of the allegations made the basis of his Complaint.  Per Lee County Sheriff's Office policy, an inmate has the opportunity to appeal any grievance to me if he were not satisfied with the response at the lower levels in the chain of command.  The Plaintiff has not appealed any grievance to me. Accordingly, the Plaintiff has failed to exhaust his administrative remedies at the Lee County Detention Center.

68.     I swear, to the best of my present knowledge and information that the above statements are true, that I am competent to make this affidavit and that the above statements were made by drawing from my personal knowledge of the situation.

10

JAY JONES

**SWORN TO** and **SUBSCRIBED** before me this _4_ day of December, 2006.


NOTARY PUBLIC
My Commission Expires:_MY COMMISSION EXPIRES FEB. 10, 2007_

11